HARRY S. WILLIAMS v. STATE.

No. A-9177. Sept. 17, 1937.
(71 Pac. 2d 781.)

A. J. Stevens and David Tant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J.  Harry S. Williams was convicted in the district court of Woods county of the crime of grand larceny upon an information charging that on the 24th day of November, 1935, in said county, he did take and steal

400 gallons of gasoline, of the market value of $48, the property of the Farmers' Independent Oil Company.

The jury by their verdict assessed his punishment at confinement in the state penitentiary for one year. He has appealed from the judgment rendered upon such conviction.

The following brief statement of the facts and the testimony will be sufficient to make clear the contentions made:

It appears that the Farmers' Independent Oil Company had storage oil tanks in the city of Alva between the Rock Island and Santa Fe tracks. The sheriff and two deputies had been watching near the tanks for about an hour and a half before the defendant and two other men drove up to the tanks with a tank trailer attached to the car. They were eyewitnesses to the taking of the gasoline stolen.

Nels Nelson, deputy sheriff, testified:

"About a quarter to 9 o'clock on the night of November 24, 1935, we saw a car with a tank trailer attached, drive in south of the Sinclair and Unity tanks, then the lights were turned out, the car came over to the Farmers' Independent Oil Company tanks, which were on a cement foundation about four and one-half feet high. Two men got out of the car, and the tank trailer was backed up to a tank. We could hear some hammering and then heard gasoline coming out of the big tank and running into the tank on the trailer; it had run for several minutes, and the man on the ground got up on the trailer, and said, 'Cut it off.' Then we turned our flash lights on them, we were perhaps 30 yards from them; at that time we heard a voice call, 'Look out.' The two men at the tank ran, one north and the other one west; I caught the man that ran west, he first asked me who had him;

I turned the light in his face and saw it was Harry Williams. Dewey Randall was with me and assisted in it; we took Mr. Williams down to the gas tank; I went to the Roller Mills office and called Mr. Woods, and Mr. Huff, also Phil Walton, and they hauled the gasoline over to the service station of the Farmers' Independent Oil Company."

He further testified that when he caught the defendant:

"He asked me to turn him loose, and I said, 'You are stealing from them, Harry,' and he said, 'Yes, I was, but that is the first time I ever robbed them,' and he put his arms around me and begged me to let him go, and I said, 'You were stealing from them, Harry,' and he still tried to pull loose, and Mr. Randall helped me. He said, 'Let's talk this thing over.' I said, 'No, let's go to the car.' He said: 'My God, let me go; I will do anything, I will come to the office in the morning.' We took him over to where Mr. Greer was, and I went and called the other men."

The testimony of Ken Greer, sheriff, was in substance the same as that of the first witness. He further testified that when he took charge of the defendant he asked Mr. Randall if he had searched him. He said, "No," and he told him to search him. Then the defendant, Williams, said: "Ken, what do you think I am, a hijacker? This is the first time I ever stole anything in my life." That when Mr. Walton arrived he asked him if he gave Mr. Williams permission to haul any gasoline from those tanks, he said, "No," and Mr. Williams said to Mr. Walton, "You have got the goods on me," or something like that. That after the defendant was placed in jail he asked him who the other two men were. He said two fellows came to his place that night and hired him to haul a load of gasoline for them out about Freedom, and

they were to give him $4 to haul this load; he gave their names as Bud Manning and Sam Welch.

The testimony of Dewey Randall, deputy sheriff, was substantially the same as that of the other two witnesses. He further testified that he came up where Mr. Nelson was scuffling with the defendant and took hold of him; Williams said, "Let's talk this thing over, this is the first time I ever stole anything from them," or something to that effect.

Phil Walton testified he is and has been manager of the Farmers' Independent Oil Company for more than three years last past; that he was called to the company storage tanks that night and arrived there ten minutes after nine; that Mr. Williams pointed to the tank and asked him if that was our tank. He said, "Yes, they are." Williams said, "Well, boys, you have me with the goods on." He found one lock on the tank unlocked with a key, the top of the gate on the other had been taken off, and it had been opened with a pair of pliers; that both valve tops were locked with one chain, which had been broken; that he did not give any one consent to take any gasoline from the tanks. That there were 400 gallons of gasoline found in the trailer tank; that the hose connecting the company tank with the trailer tank did not belong to the Farmers' Independent Oil Company; that the market value of the gasoline taken was 12 cents a gallon.

As a witness in his own behalf the defendant testified: That he had been living in Alva since 1921, was a graduate of the high school and Normal College at Alva. That he had been engaged in the gasoline business for several years. That about 2 o'clock in the afternoon of November 24, 1935, two fellows came to his station driv-

ing a Chevrolet car and wanted to buy 400 gallons of gasoline, and he did not have stock sufficient on hand to let them have that much, but told them before they left that if they made any deal to buy any he would like to figure with them on hauling it. That when they came back they told him their names were Bud Manning and Sam Welch, and they engaged him to transport in his tank car 400 gallons of gasoline, telling him that they had bought it from the Farmers' Independent Oil Company. They showed him a ticket for 400 gallons and it had the name "Phil" on it. That his tank car was not in good condition, and he and these two men spent the balance of the afternoon getting the car ready to haul the gasoline. That about 7 o'clock they left the station to go to the tanks, going a block north, a block east, then turned into the driveway that goes to the tanks on the railroad right of way. That he was driving a Buick sedan with a tank trailer. That he unhooked the trailer and they backed it by hand to the tank; then he backed his car up and they hooked the trailer to the car before they loaded it. That he had turned off the lights on the car, but they had two flashlights. One man got up on the platform; he had the key and opened the valve; that he stayed on the trailer with a measuring stick and used it to measure the 400 gallons; then he told them to turn it off, one of the men hollered, "Look out!" and started to run, and he started to run with him and went 125 yards before Mr. Nelson caught up with him, and said, "Who are you?" Mr. Nelson flashed a light in his face and said: "Is it you, Harry? What were you doing down there?" And he said: "I am getting ready to haul some gasoline." About this time Dewey Randall came up and witness said: "My God, Nels, if you think I am stealing this gasoline, turn me loose, and get those other fellows;

I was not stealing it." "We started back, Ken Greer was standing there waiting for us." That he had run about 100 yards when he heard shots fired. That the next morning he told Sheriff Greer that they had hired him to haul gasoline, and that was why he was there. That he had a conversation there with Phil Walton and asked him if he sold any gasoline to any fellows that afternoon, but did not make the statement to Mr. Walton that, "You have got the goods on me this time." He also denied having made the statements testified to by the officers that: "This is the first time I ever stole anything. This is the first time I ever robbed them."

Three witnesses testified that they called at the defendant's service station in Alva that day and saw two men working on a car or trailer.

The first assignment of error is that: "The verdict of the jury is not supported by the evidence."

Considering all the facts and circumstances in the case, there can be no doubt as to the sufficiency of the evidence to sustain the conviction.

The commission of the crime was proved by uncontroverted evidence; the voluntary admissions of guilt on the part of the defendant at the time of his apprehension were shown by the testimony of four witnesses. We regard the circumstances established against the defendant amply sufficient to sustain the verdict. The inferences properly to be drawn from such circumstances point unerringly to his guilt. The taking was on a Sunday night. The lights on the defendant's car were turned off before entering the tank yard. When intercepted there was flight, and the apparent intentional neglect to make inquiry before engaging in a doubtful transaction indicates guilty knowledge. His explanation is unbelievable and

scarcely arises to the dignity of evidence. Without any doubt the contention made is without merit.

The second assignment is:

"Error of the court in reprimanding defendant's counsel, which prevented the defendant from having a fair and impartial trial."

This assignment is based upon the following excerpt from the record on cross-examination of the witness Nelson:

"Q. How long after you got back with your man was it until Mr. Greer returned? A. We were about half way back to the car when Mr. Greer came. Q. You hadn't gotten back when Mr. Greer came back? A. No, sir, we were having quite a time carrying Harry. Q. I didn't ask you that, just answer my question. The Court: Now, he did answer your question, don't start any abuse of the witness. Mr. Tant: I want to save exceptions to the court's remark. The Court: The court will call you down when you get out of line. Mr. Tant: Exceptions."

This assignment requires no discussion. It is obviously without merit.

The third assignment is:

"Error of the court in refusing to allow the defendant to introduce testimony tending to show the bias and prejudice of the complaining witness against the defendant."

The record shows that the witness Walton on cross-examination testified:

"Q. Now, you and Mr. Williams have had some trouble between you, have you not? A. No, sir, I would not say it was trouble, no, sir. Q. Well, there has been some difference between you? A. Some little difference, yes, sir. Q. You have made efforts to get wholesalers to discontinue furnishing him gas, have you? Mr. Lesley: That is objected to as incompetent, irrele-

vant, and immaterial. The Court: Objection sustained. Mr. Tant: Exceptions. Q. I will ask you the question this way. You have, through your influence as manager of this big concern down here, have had him cut off from his supply of gas, haven't you? Same objection. Sustained. Mr. Tant: Give us exceptions. This testimony is offered for the purpose of showing the witness' interest, and if permitted to answer the question propounded, he would state substantially that there was a business difference and difficulty existing between this witness and the defendant and that he has, through his influence with the wholesale dealers, caused the wholesale dealers to stop selling this defendant gasoline, and it will show there was a difference existing between them and he was making an effort to force this defendant out of the gasoline business. Mr. Lesley: The state objects for the reason it is incompetent, irrelevant, and immaterial and not proper cross-examination. The Court: Objection is sustained. Mr. Tant: Exceptions."

As a general rule it is not competent to cross-examine a witness as to any distinct collateral fact not brought out in the examination in chief, with a view of impeaching his testimony by introducing other witnesses to contradict him. And, if a question as to such collateral fact be put to a witness with intent to discredit his evidence, his answer must be taken as conclusive. No evidence can be introduced afterwards to contradict him. Payne v. State, 10 Okla. Cr. 314, 136 Pac. 201; Willis v. State, 13 Okla. Cr. 700, 167 Pac. 333.

In Wharton on Ev., par. 559, the rule is stated thus:

"In order to avoid an interminable multiplication of issues, it is a settled rule of practice that, when a witness is cross-examined on a matter collateral to the issue, he cannot, as to his answer, be subsequently contradicted by the party putting the question."

It follows that the ruling of the trial court in excluding this proffered evidence was correct.

The fourth assignment is based on the refusal of the court to allow the defendant to introduce evidence to show his financial condition at the time of the alleged offense.

The defendant testified that he had about $200 on his person when arrested; that he had sold his property on 64 Highway the day before.

He was then asked:

"Q. What was the consideration for the sale? State's objection as incompetent, irrelevant, and immaterial sustained. Mr. Stevens: Give us exceptions. We offer it for the same reason given for the other question. The Court: He has already answered the other one. Mr. Stevens: He didn't state what the consideration was. The defendant now offers to prove by this witness, Mr. Williams, that on the day before this transaction he sold his property on Highway 64 for $7,500, $4,000 or thereabouts of which was cash, and this is to show the unlikelihood of Mr. Williams, at that time stealing $48 worth of gasoline. The Court: Objections sustained."

It is sufficient to say there was no error in the rulings of the court.

The remaining assignments of error are that the court erred in giving to the jury a certain instruction and erred in refusing to give an instruction requested by the defendant.

It appears that no objection was made or exception taken to any of the instructions given by the court. Considered as a whole, the instructions given correctly cover the law of the case.

The court refused to give the jury an instruction to the effect:

"If you believe the said defendant did not have an understanding or agreement with said parties to. steal said oil, but that he was merely employed by them to haul it, then you should find the defendant not guilty."

While we are inclined to think the instruction requested should have been given, however, the instructions given in a general way covered the theory of the defense. We are clearly of the opinion that the court did not commit prejudicial error in refusing to give the requested instruction.

This court is not permitted to reverse a rightful judgment of conviction on the ground of misdirection of the jury unless, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. Section 3206, St. 1931 (22 Okla. St. Ann. § 1068).

No other reason for reversing the judgment having been assigned, and finding the record free from reversible error, the judgment of the lower court is affirmed.

DAVENPORT, P. J., and BAREFOOT, J., concur.