## STATE v. NEMIER et al.

No. 6634. Decided April 14, 1944. (148 P. 2d 327.)

308

See 22 C. J. S. Criminal Law, sec. 682. 20 Am. Jur. 288.

*McCullough & Ashton, E. M. Morrissey,* and *Harold N. Wilkenson,* all of Salt Lake City, for appellants.

*Grover A. Giles, Atty. Gen.,* and *Zar E. Hayes,* Asst. Atty. Gen., for respondent.

WADE, Justice.

On July 4, 1943, while a program was being given in the state prison, Pat McLaughlin and the defendants Standard and Nemier, all inmates thereof, armed themselves with knives and attacked the prison guards. Obtaining the upperhand they threatened to kill the guards unless they gave up their guns, together with the keys to the armory and to an automobile standing in the prison yard and opened the outside gate. The guards complied with their demand and the three inmates with guns and ammunition made their escape with the automobile. A general alarm was sent out and some Salt Lake City police officers contacted the automobile with the escaping inmates between the state prison

and the business district of that city. A gun battle ensued into, through and beyond the business district of Salt Lake City and ended when the car driven by the inmates was sideswiped by a police car and overturned, killing Pat McLaughlin.

The defendants were recaptured. At that time they were each serving an indeterminate sentence for robbery of from five years to life. Thereafter they were charged under what is now section 103-7-12, U. C. A. 1943, with an assault with a deadly weapon upon the prison guards while undergoing a life sentence, and were tried, convicted and sentenced to be executed. From this decision they have appealed to this court.

The defendants were tried jointly. In choosing the jury, the court ruled that the defendants were entitled to ten peremptory challenges which must be exercised collectively, and each defendant was entitled to two additional challenges which he could exercise separately. To this the defendants excepted and contend that the court erred in not allowing each to exercise ten separate peremptory challenges. Section 105-31-2, U. C. A. 1943, provides:

"If two or more defendants are jointly tried they shall collectively be allowed the number of peremptory challenges specified in section 105-31-15 only in case they join in such collective challenges, but in addition to such challenges each defendant shall be allowed the following number of peremptory challenges which may be separately exercised:

"(a) Two, if the offense charged is punishable by death."

Section 105-31-15, U. C. A. 1943, provides:

"The state and the defendant shall each be allowed the following number of peremptory challenges:

"(a) Ten if the offense charged is punishable by death."

Defendants contend that section 105-31-2 applies only where no defendant objects to joining in the collective per-

emptory challenges, but if any defendant objects thereto such defendant is entitled to the full number of challenges specified in section 105-31-15, which he may exercise separately. This position is not tenable. Section 105-31-15 clearly contemplates that each side, the state and the defendants, shall have an equal number of peremptory challenges. Prior to the 1935 amendment section 105-31-2, R. S. U. 1933, provided that:

> "When several defendants are tried together they cannot sever their challenges but must join therein." Utah Code 1933, 105-31-2.

Under that law it was clear that the defendants were only entitled to the same number of peremptory challenges as the state and that they must exercise them jointly. There is nothing in the amendment which indicates that the legislature intended to change the law on this point, it merely gave the defendants additional peremptory challenges which could be exercised separately and made other changes in other respects. Under the amendment it is clear that if collective challenges are taken they must be joined in by all defendants. Thus a challenge which is objected to by any defendant should not be allowed, but the defendants do not here complain that the court refused to allow challenges to which they objected. Their complaint is that the court refused to allow them ten separate challenges each but required them to make their ten challenges collectively. Where there are two or more defendants the statute does not provide for additional separate challenges if defendants refuse to joint in the collective challenges. It provides for collective challenges which can only be exercised jointly. The ruling of the court was therefore correct.

The defendants were charged with an assault on the prison guards, not with escaping from the prison. When they left the prison that offense was complete. The encounter with the city police and the gun battle through the streets which followed constituted another and separate offense against different persons. Defendants contend that it was error to admit proof of these later events in

evidence. It is universally recognized that the state may not prove other similar offenses committed by accused merely to show his bad character and propensity to commit similar crimes and infer therefrom that he probably committed the crime charged. Such evidence is irrelevant, that is, its tendency to prove that the defendant committeed the crime charged is not great, as compared with the danger that the court or jury will give undue weight to the prejudice of the accused. It is, however, recognized that if the facts which constitute the collateral offense are relevant, that is they inherently tend to establish any of the necessary elements of the crime charged, other than by merely showing defendant's bad character and propensity to commit similar crimes, proof of such facts is admissible in evidence, even though such proof shows that defendant has committed other offenses. It is often said that:

"The party cannot, by multiplying his crimes, diminish the volume of competent testimony against him." *People* v. *Cione*, 293 Ill. 321, 127 N. E. 646, 650, 12 A. L. R. 267.

This is the correct basis of this rule both historically and logically, but in recent times it is almost universally stated by courts and writers as a general rule, that on the trial for one offense the state may not prove other similar offenses; many exceptions to this rule are however recognized. *State* v. *Kappas,* 100 Utah 274, 114 P. 2d 205; *State* v. *Anderton,* 81 Utah 320, 17 P. 2d 917; *State* v. *McGowan,* 66 Utah 223, 241 P. 314; *State* v. *Bowen,* 43 Utah 111, 134 P. 623; *People* v. *Coughlin,* 13 Utah 58, 44 P. 94; *People* v. *Molineux,* 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193 and note thereto; 1 Wigmore on Evidence (3rd Ed.), Sections 194, 216; Model Code of Evidence proposed by the American Law Institute, 1942, page 196, Rule 311 and comment thereon, Julius Stone has written two excellent articles entitled "The Rule of Exclusion of Similar Fact Evidence." 46 Harvard Law Review 954 (1933), England; 51 Harvard Law Review 988 (1938), America. At page 1008 note 113, the author says:

"Very frequently there is found in the cases some form of rule like the following: 'Evidence of similar offenses are never admissible except to prove some fact in issue.' Now obviously this form of statement is substantially the original rule, putting the substance of the old into the form of the new. * * * See e. g., 8 R. C. L. (1914) 199: 'The rule against admitting proof of extraneous crimes is subject, however, to certain exceptions. In making proof it is competent for the prosecution to put in evidence all relevant facts and circumstances which tend to establish any of the constitutive elements of the crime of which the defendant is accused.' This was adopted by the court in *State* v. *Anderton*," and other cases.

Thus the court, in the Anderton case, adopted the same test which is suggested above, but states that test as an exception to a general rule of exclusion. In the case of *People* v. *Coughlin*, supra, in the Utah report, page 67, 44 P. at page 96, we said:

"The defendant also alleges that the court erred in permitting Sheriff Harrington and Williamson to testify that Coughlin [the defendant] and George shot at them at the sheep wagon, four days before the killing of Dawes and Stagg. It will be remembered that when Harrington and Williamson first saw Coughlin at the wagon he had his gun leveled upon them, and when Harrington told them to 'put his gun down and quit his foolishness' he fired at the officer, and continued shooting until he had wounded the deputy, and until both officers had retreated out of reach of his bullets. The conduct of Coughlin on this occasion indicated a purpose to kill any person who might attempt to arrest him. It manifested a deliberate intention to kill all such persons."

There the court does not even state any general rule of exclusion, although it had previously stated such rule in discussing another point, but it merely points out that evidence is admissible, even though it proves another offense, where it shows a purpose to kill any one who might attempt to make an arrest. That case is similar on its facts to the present case. There the evidence received, which constituted another offense, indicated a purpose on the part of the defendant to kill any one who attempted to arrest him; here the evidence objected to indicates a purpose or design to kill

or do great bodily harm to any one who attempted to interfere with the defendants' escape.

The defendants produced evidence to show that, when they drew their knives, and later the guns on the prison guards, and threatened to kill them if their demands were not complied with, they believed that it had been fixed with the guards to allow them to make their escape without resistance, and that in so doing they had no intention of harming the guards but would have peaceably submitted had resistance been offered. Under such a state of facts the defendants would not be guilty of the offense charged. The trial court so held and instructed the jury to acquit the defendants in case of a reasonable doubt of their intention to harm the guards if their demands were not complied with. The defendants did not deny that they drew knives on the guards and threatened to kill them in case of resistance, the only substantial dispute in the evidence was whether the defendants intended to kill or do the guards great bodily harm in case of refusal to comply with their demands.

Every act of the defendants from the time they drew the knives on the prison guards until they were recaptured tended to indicate a purpose or design to fight their way to freedom by using all the force at their command and to injure or even kill any one who stood in their way. The facts that they armed themselves with guns and ammunition, drove from the prison in broad daylight with a car that could be readily recognized, and made no effort to conceal their identity or to avoid encounter with the police, that when they contacted the police they did not surrender but increased their speed and engaged in a shooting battle until their car was wrecked and their companion killed, strongly tends to indicate that they had planned to take desperate chances, and intended to use whatever force was necessary and within their power to make their escape. The fact that they were willing to shoot it out with the police force tends to show that they intended to do the same with the prison guards in case of resistance. The state as a part of its case was required to prove such

intention as a necessary element of its case, and for that purpose this evidence was admissible, even though it showed that the defendants were guilty of a collateral offense other than the one for which they were being tried. See authorities cited above and also 2 Wigmore on Evidence, 3rd Ed., Sections 237, 242, 300, 304, 363 and 364; *Gaines* v. *Commonwealth,* 242 Ky. 237, 46 S. W. 2d 75, *State* v. *King,* 111 Kan. 140, 206 P. 883, 22 A. L. R. 1006.

In instruction 9, the court said:

"The term 'malice' in its legal sense, as used in these instructions, denotes either a wish to vex, annoy, or injure another person, or it denotes that condition of mind which manifests itself in the willful and intentional doing of a wrongful act against another without just cause or excuse."

Counsel argues that this instruction required the jury to convict the defendants if they found that they committed the assault but only intended thereby to merely vex or annoy the guards, but had no intention of doing them great bodily injury in case of refusal to allow the defendants to escape. Had the court given no other instruction on this subject there would be much force to this argument. If that was the effect of these instructions they were clearly erroneous. Defendants were prosecuted under Section 103-7-12, U. C. A. 1943, which provides as follows:

"Every convict undergoing a life sentence in the state prison, who, with malice aforethought, commits an assault upon any other convict, or upon the warden or any guard or upon any other person whomsoever, with a deadly weapon or instrument of any kind, or by means of force, or by administering any poisonous or deleterious substance which will likely produce great bodily injury, is punishable with death."

This section provides that if a "convict undergoing a life sentence," "with malice aforethought," commits an assault upon another person, "with a deadly weapon or instrument of any kind, or by means of force, or by administering any poisonous or deleterious substance which will likely produce great bodily injury" he "is punishable

with death." The death penalty is mandatory. Even in the case of murder in the first degree, on the recommendation of the jury, the court may reduce the penalty to life imprisonment, but here the court has no alternative. Such an assault must be committed "with malice aforethought." That is the term used to distinguish "murder" from other kinds of homicide. In the recent case of *State* v. *Russell*, 106 Utah 116, 145 P. 2d 1003, we pointed out that the killing must be done with the specific intent, either to kill, or to commit certain felonies, or to do great bodily harm, or to do an act knowing the same to be likely to cause great bodily harm. The use of this term together with penalty and other requirements of this statute indicate that it would require a similar intention to that required to commit murder. *People* v. *McNabb*, 3 Cal. 2d 441, 45 P. 2d 334. An assault is defined as "an unlawful attempt coupled with a present ability to commit a violent injury on" another, Section 103-7-1, U. C. A. 1943. By the nature of an assault it does not require an intent in all events to kill or do great bodily injury, but an assault committed with malice aforethought, does require something more than the mere wish to vex or annoy the person assaulted. It is not necessary for us to here determine what intent is necessary under all possible circumstances in order to commit the offense charged, but under the facts and circumstances of this case, unless the defendants at the time they drew their knives and guns on the guards had formed an intention or design to gain their freedom by force and if necessary to accomplish their purpose, to inflict great bodily injury on the guards, they were not guilty of the offense charged. The term "malice" is sometimes used to indicate the mere wish to vex or annoy another, but it is not so used in this statute, and such definition in this case would tend to confuse rather than help the jury and should not have been given.

The state urges that this error was cured by the giving of instructions 15, 16 and 17. In instructions 15 and 16 the jury were told that if they found that the defendants threatened the guards with a gun or knife, but "had no present

intention of inflicting personal injury or bodily harm" on such guards then they must find the defendants not guilty. In instruction 17, the jury was told that if they found that the defendants believed "that said guards would permit them to escape by not interfering with them, so that the defendants had no present intention of inflicting any bodily harm upon" them the defendants should be acquitted. Had these instructions used the term "great bodily injury" they would have correctly stated the law. It is not necessary to determine whether this was prejudicial error.

The defendant Standard testified that prior to his conviction he had worked for a glass company, and before that he served three years in the Navy where he had received a medical discharge on account of being subject to epilepsy. On cross-examination he was asked if he had not stated to Lote Kinney, about a year before, that his occupation was "hoistman, gambler, burglar, bunco, and all those things," to which he answered that he did not remember so stating. Later Lote Kinney was called and testified that Standard had made such a statement to him. Defendant Standard objected to this testimony and now assigns its admission as error. The state concedes that this was character testimony and was inadmissible except where first opened up by defendant, but contends that here the defendant by his own testimony attempted to show that he was a man of a reputable occupation, and therefore it had the right to rebut such testimony by his own statement to the contrary. The testimony of Mr. Kinney did not tend to prove that defendant had not worked for a glass company, or that he had not been in the Navy, or that his discharge had been for reasons other than stated by him. It merely tended to show that his occupation generally had been one of crime. The defendant did not open up his general occupation by his testimony, and it was therefore error to receive this testimony in evidence.

Defendants contend that the term "every convict undergoing a life sentence" as used in Section 103-7-12, U. C. A.

1943, was not intended to include a person who, like defendants, was serving a sentence of from five years to life under the indeterminate sentence law, but was only intended to include persons serving a definite sentence or life imprisonment. We have repeatedly held that an indeterminate sentence is a definite sentence for the maximum term therein stated, unless it is commuted or terminated or the prisoner is paroled or pardoned by the Board of Pardons. *Mutart* v. *Pratt*, 51 Utah 246, 170 P. 67; *Lee Lim* v. *Davis*, 75 Utah 245, 284 P. 323, 76 A. L. R. 460; *State* v. *Roberts*, 91 Utah 117, 63 P. 2d 584; *Cardisco v. Davis*, 91 Utah 323, 64 P. 2d 216. But none of these cases were construing the convict assault statute involved in this case. However, there is a California case, *People* v. *McNab*, 3 Cal. 2d 441, 45 P. 2d 334, in which it was held that a person serving a sentence of not less than five years, under the indeterminate sentence statute, was undergoing a life sentence under the provisions of a statute similar to ours. This case is directly in point. The court reached that conclusion relying on cases similar to our cases cited above. This is the ony case directly in point which has been called to our attention.

Our convict assault statute now 103-7-12, U. C. A. 1943, first appeared as Chapter 10, page 8, Laws of Utah 1909, it was prior to the enactment of the indeterminate sentence law, now Section 105-36-20, U. C. A. 1943, which first appeared as Chapter 100, page 192, Laws of Utah 1913. At that time the court was required in all cases to pass a definite sentence within the limits provided by the statute. Under the law as it then existeded a person convicted of a crime carrying a minimum penalty of less than life and a maximum penalty of life, would not undergo a life sentence, unless the trial judge, in view of all of the facts and circumstances brought to his attention, pronounced a definite sentence of life imprisonment. Such cases were no doubt comparatively few. But under the indeterminate sentence law, except in murder and treason cases, the trial court cannot fix a definite term, but must pass sentence of imprisonment for a period of not less than the minimum and not more than

the maximum provided by law. Thus if all persons serving a sentence, the maximum term of which is for life, are undergoing a life sentence under the convict assault statute, the number of persons coming within that statute was greatly enlarged by the enactment of the indeterminate sentence law. If, however, we take the other view, that only such persons who are serving a definite life term are undergoing a life sentence, then all cases under the indeterminate sentence which carries a minimum of less than life cannot possibly come within the provisions of this statute, although some of them might have under the law before the enactment of the indeterminate sentence law. The argument that the death penalty was provided in this statute because there is no other punishment that can be inflicted on a person undergoing a life sentence is not tenable because the Board of Pardons can and does commute death penalty and life sentences, as well as those of less severity, and in considering each case, the behavior of the applicant while serving his term is an important factor. The fact that the death penalty was made mandatory indicated that this statute was intended to apply to only the most hardened criminals, and was not intended to be extended to all cases where the maximum penalty is life imprisonment.

In the recent case of *State* v. *Walsh,* 106 Utah 22, 144 P. 2d 757, we held that an indeterminate sentence of from one to ten years, is not a sentence of not less than three years, as that term is used in the habitual criminal statute. Practically all of the reasons there given for that decision apply with equal force to the facts of this case. We therefore hold that a person serving a sentence of from five years to life under our indeterminate sentence law, is not undergoing a life sentence as that term is used in Sec. 103-7-12 and that this decision must therefore be reversed. Since the offense denounced in section 103-7-11, U. C. A. 1943, would be an included offense within the offense denounced in section 103-7-12, the case is remanded to the district court for a new trial.

WOLFE, Chief Justice (concurring).

The opinion states that "practically all of the reasons" given for the decision in *State* v. *Walsh,* 106 Utah 22, 144 P. 2d 757, apply with equal force to the facts of this case. Certainly the statute requiring indeterminate, rather than fixed terms, must be made to mesh with this Sec. 103-7-12. Not so very infrequently the legislature makes a change in one statute evidently without a full comprehension of how it affects processes of the law embodied in other statutes and yet in such a way as not to work an implied repeal. It then becomes the task of the court to infer or perhaps we should say reconstruct the intent of the legislature. A legislative intent is not always definitely in the mind of each legislator. The intent must be gleaned from objectives which the act seeks to accomplish. This may be gathered from committee reports but primarily from the act itself and other acts which reflect upon it and show a common overarching design. In *State* v. *Walsh* we found that the paramount objective of the Legislature was to brand a man as an habitual criminal only when it had been definitely determined by competent authority that the circumstances surround the commission of the antecedent crimes were such as to warrant at least three years of imprisonment. That was the overarching social purpose. We found that this pattern had not been disturbed by the passing of the indeterminate sentence law but that on the passage of that law the previously passed act on habitual criminality did not exactly mesh with the indeterminate sentence law. We had the choice of being strictly logical or of serving the objectives which the legislature sought to consummate. We chose the latter because we realized that law is not logic and not always logical. It is meant to serve the people and to comport with objectives which they, through their legislature, desired to reach. Had we applied the holdings of those cases, which for the purpose of constitutionality held the upper limit of the range to be the sentence imposed, we would have been logical but would have all parted from the paramount social purposes enunciated by the legislature. Likewise in this case if we take

the "life sentence" as meant by Sec. 103-7-12 to be the same as the upper life limit of an indeterminate sentence we would be strictly logical but would not have served the intent of the legislature which at the time it was passed could only have been to require the death sentence to be imposed under Sec. 103-7-12 when the crime for which the convict was incarcerated was one for which he had actually and definitely been given, not an indeterminate sentence with the upper limit life, but an out and out life sentence. When the intent of the legislature is to forfeit a life upon conviction under Sec. 103-7-12, only when he is serving a sentence actually and definitely fixed at life, and not one which by mere failure of the Board of Pardons to act may be for life, we cannot for the sake of logic hold that his life should be otherwise taken. Moreover, the principle that all doubts regarding the construction of a criminal statute must be resolved in favor of the defendant applies with especial force when the penalty is death.

McDONOUGH, Justice (concurring).

I concur. Should the construction of 103-7-12, U.C.A. 1943, contended for by the state, be adopted rather than that herein given, anomalous situations, not reasonably to be ascribed to be within the contemplation of the legislature by its action in passing the indeterminate sentence statute, would result. For example, under the statutes, one convicted of murder in the second degree may be punished by imprisonment for a definite number of years less than life; though he may be sentenced to prison for life. 103-28-4, U. C. A. 1943. *Lee Lim* v. *Davis,* 75 Utah 245, 284 P. 323, 76 A. L. R. 460. But one convicted of assault with intent to murder is punishable by imprisonment for an indefinite term of five years to life. 103-28-14, U. C. A. 1943. Hence, if A commits an assault upon C with intent to murder the latter, the sentence prescribed by statute to be pronounced by the trial court is a life sentence under the construction of 103-7-12, U. C. A. 1943, urged by the State. But if B murders C and the jury returns a verdict of second degree

murder, the court may sentence B to a term of years less than life. Should the court in the situation last suggested pronounce a sentence of 25 years, and in the assault case pass sentence as prescribed by law; and thereafter the two convicts commit an assault of the character which comes within the provisions of 103-7-12, U. C. A. 1943, upon conviction of A the court has no discretion but to sentence him to death; but B cannot properly be charged under 103-7-12 since he is not undergoing a life sentence, and upon his conviction under 103-7-11 the limit of the court's power is to sentence him to a term of from 3 to 20 years.

Again, assume that D is convicted of robbery and he is sentenced and committed to prison for a term of "five years to life"; which is his first conviction of felony. Then assume that E is convicted of an attempt to kill by poison. He is sentenced and committed for a term of 5 to 20 years, pursuant to 103-28-13, U. C. A. 1943. Assume also that he had theretofore served a term of imprisonment for a similar offense. Should such two convicts commit an assault such as that here charged, upon conviction D must be sentenced to death, but E cannot be.

The foregoing examples are not cited to suggest that because certain results attend upon a given statutory construction which do not comport with the court's conception of equal justice, some contrary construction will be adopted, though it does violence to the language of the statute. The statute here construed being susceptible of more than one construction, instances in which certain results follow upon a proposed construction are set out to support the reasons given in the opinion of the court for adopting the alternative construction.

LARSON, Justice (dissenting in part).

I dissent. I concur with much that is said in the opinion of Mr. Justice WADE, but after skillfully driving the car around several dangerous curves, the driver, in an effort to dodge a chicken in the road, seems to lose control of the

car and is thrown into the barrow pit. I concur in holding that where defendants are tried jointly, their peremptory challenges of prospective jurors allowed by Sec. 105-31-15, U. C. A. 1943, must be exercised collectively. The additional challenges allowed by Section 105-31-2, U. C. A. 1943, to each defendant tried jointly, are to enable one such defendant to excuse a prospective juror as to whom a co-defendant does not join in challenging. This allows the defendants tried jointly more challenges in comparison to those allowed the state than if they were tried separately.

I agree it was not error to admit in evidence the testimony relative to the conduct of defendants in attempting to elude capture after their escape from prison. I subscribe to the pronouncement that the definition of malice in Instruction 9 was an erroneous definition of malice as the term is used in Sec. 103-7-12, U. C. A. 1943; and agree that "malice" as there used has the same meaning as the malice involved in the term "murder" as defined in *State* v. *Russell*, 106 Utah 116, 145 P. 2d 1003. Although Instruction 9 was somewhat confusing and erroneous, and should not have been given, it was not of such prejudicial nature as to disturb the judgment. Instructions 15, 16 and 17 were such as to make it unreasonable to believe the jury could have been misled by such an abstract statement of law as Instruction 9.

The prevailing opinion holds it was error to admit in evidence the testimony of Lote Kinney quoting statements made to him by Standard a year before the offense, as to his occupation. I am unable to determine from the opinion if such constitutes reversible error or whether the discussion is merely cautionary in view of a new trial being ordered. If it is to be assumed as holding this admission of evidence necessitates a reversal of the judgment, from such conclusion, I dissent. I am not prepared to say it was error at all. Justification for this evidence need not rest upon the theory that defendant had put his general character and reputation in evidence by testifying that he had been in the navy and that he had worked in a glass factory. The defendant made himself a witness, and as such he was subject

to cross-examination the same as any other witness. *State* v. *Vance,* 38 Utah 1, 110 P. 434; *State* v. *Hougensen,* 91 Utah 351, 64 P. 2d 229; *State* v. *Turner,* 95 Utah 129, 79 P. 2d 46. On cross-examination, he was asked if a year earlier he had not stated to Lote Kinney that his occupation was "hoistman, gambler, burglar, bunco and all those things." That such question on cross-examination is not objectionable and permitting it not error is recognized by almost all the authorities. *State* v. *Hougensen,* supra. The only objection that could be urged is that it is collateral matter and irrelevant, an objection which does not lie to cross-examination. The rule is generally stated that one may cross-examine on collateral matters, but the witness is not subject to impeachment. *Williams* v. *State,* 62 Okla. Cr. 394, 71 P. 2d 781; *State* v. *Johnson,* 192 Wash. 467, 73 P. 2d 1342; *People* v. *Pollack,* 31 Cal. App. 2d 747, 89 P. 2d 128; *People* v. *Burness,* 53 Cal App. 2d 214, 127 P. 2d 623. This, however, is not exactly a correct statement of the rule. The scope of cross-examination on collateral matters is within the discretion of the trial court, and its rulings thereon will not be disturbed if within a reasonable discretion. So, too, impeachment of a witness for such statements made on cross-examination is a matter on which the trial court should be permitted reasonable latitude. If the situation or the statement is such as might be of value in determining the credibility of the witness, it should be permitted. It is excluded only when the court can say it is so far collateral, or so irrelevant that its tendency to distract the mind of the jury from the real issue would be greater than the value of the evidence as an element in determining credibility. The evidence here involved is not evidence of other crimes nor is it evidence of reputation, sometimes called character evidence in the decisions. It is defendant's own statement which reflects his state of mind and method of speech at serious moments. It may imply a loose habit of expression, a braggadocio attitude, a lack of careful intelligent response, which may be of moment in considering the reliability and weight of his testimony. It is not what other people say or

think of him. It is his own characterization of himself, or a devil may care boastful way of talking on serious questions that may affect his credibility much more than it might mislead the jury as to the issue. As to what purpose it could serve and what effect it might have is a matter the trial court could better determine than this court. I am inclined to think its admission is not error. Certainly it was not of such nature as to require a reversal of the judgment. See *Schooley* v. *State*, 176 Ark. 895, 2 S. W. 2d 67; *People* v. *Arnold*, 199 Cal. 471, 250 P. 168; *People* v. *Baxter*, 245 Mich. 229, 222 N. W. 149; *People* v. *Goodwin*, 105 Cal. App. 122, 286 P. 1087; *Hall* v. *United States*, 8 Cir., 277 F. 19; *Fuller* v. *State*, 21 Ala. App. 300, 107 So. 731; *Mullins* v. *Commonwealth*, 246 Ky. 748, 56 S. W. 2d 370; *State* v. *Tyler*, 220 Mo. App. 317, 286 S.W. 408.

Section 103-7-12, U. C. A. 1943, under which defendants were prosecuted, reads:

"Every convict undergoing a life sentence in the state prison, who, with malice aforethought, commits an assault upon any other convict, or upon the warden or any guard or upon any other person whomsoever, with a deadly weapon or instrument of any kind, or by means of force, or by administering any poisonous or deleterious substance which will likely produce great bodily injury, is punishable with death."

The prevailing opinion reaches the conclusion that this section applies only to persons who are serving a definite life term in prison, and does not apply to persons who under the indeterminate sentence law, may not be required to serve a life term. This conclusion, I understand, is arrived at largely upon the ground that it is deemed desirable to limit the number of convicts who are subject to the section. The court should remember its own pronouncements in prior cases, that it is the duty of the court to apply the substantive law as it is written. It is not our right to absorb the legislative function and write new provisions and meanings into the law because we may find the legislative pronouncement not in harmony with our penalogical wisdom. This section

was first enacted in 1909, as Chapter 10, Laws of Utah 1909, p. 8. As stated in the prevailing opinion, this was four years before the enactment of the indeterminate sentence law, and when passed "a life sentence" clearly meant a sentence of incarceration for life. That is to say that unless the judgment and sentence of the trial court was reversed on appeal, or unless a writ of habeas corpus from a proper court released the prisoner, or unless executive clemency was extended by the Governor or the Board of Pardons, the warden was required to keep the prisoner confined in prison until death. Sec. 105-36-20, U. C. A. 1943. At that time a life sentence could be imposed for murder in the first degree; murder in the second degree and rape. In 1911, robbery was added as an offense for which a life sentence could be imposed. In 1933, kidnapping was made an offense for which a life term might be exacted. These are the only offenses since statehood for which one could be required to undergo a life sentence.

In 1913 the Legislature enacted what we call the indeterminate sentence law, now Section 105-36-20, U. C. A. 1943, which by express provisions declares that indeterminate sentences are definite sentences for the maximum period. *Lee Lim* v. *Davis*, 75 Utah 245, 284 P. 323, 76 A. L. R. 460; *State* v. *Roberts*, 91 Utah 117, 63 P. 2d 584; *Walsh* v. *State*, 106 Utah 22, 144 P. 2d 757; *Thompson v. Harris* (*Demmick* v. *Harris*), 106 Utah 32, 144 P. 2d 761; *Cardisco* v. *Davis*, 91 Utah 323, 64 P. 2d 216; *Lee Lim* v. *Davis*, 75 Utah 245, 284 P. 323, 76 A. L. R. 460; *People* v. *McNabb*, 3 Cal. 2d 441, 45 P. 2d 334. The sentences imposed now are for a definite term just as much as were those imposed prior to enactment of section 105-36-20. The so called indeterminate sentence law does not in any way affect the period of incarceration fixed by the sentence. It merely provided for a parole system whereby the Board of Pardons may put prisoners on parole outside the prison and may also terminate or commute the sentence or pardon the prisoner.

The legislature when it first enacted Sec. 103-7-12, under

which this action is brought, also enacted what is now Sec. 103-7-11, U. C. A. 1943. That section provides that:

"any convict sentenced to imprisonment in the state prison for a term less than life, who commits an assault  *  *  *  shall be punished by imprisonment in the state prison for not less than three nor more than twenty years."

The legislature thus clearly distinguished between convicts sentenced to a term less than life and convicts undergoing a life sentence. Put in another way, it put in one class those convicts doing time for the more heinous offenses—offenses that shock the social conscience; into another class it put offenses that involve property and the violation of personal rights of less serious consequences. These statutes were enacted with the purpose of safeguarding the lives of the officials, guards, and others at the prison, and maintaining a disciplinary control over the inmates that would prevent assaults and riots within the prison. The legislature may well have done, and probably did reason, that a convict who was under sentence which could keep him imprisoned for life unless the Board of Pardons intervened, would be more likely to commit assaults with deadly weapons in efforts to escape or otherwise, since no further incarceration could be imposed upon him, than would a prisoner whose confinement could be lengthened twenty years, which to many might be tantamount to a life sentence and thus a deterrent to an assault. Then again, I think it clear that the legislature had in mind that a person who had committed a crime of such nature as to fall within the category for which the legislature had prescribed a penalty of life imprisonment is a person who must walk a chalk line or meet the most drastic exaction of the law. The prevailing opinion has implicit in its rationale the idea that when the legislature prescribed a sentence of life imprisonment for an offense it did not mean that such offense was to be considered more serious than one for which a ten year penalty is prescribed. It seems clear to me that what the legislature meant was to say to persons who committed the few serious crimes for which a life

sentence is imposed: "Within this prison you must be on your best behavior. We want no further violence from you. You have already forfeited your liberty. For any further serious violence on your part, you will pay with your life. We are not risking the lives of others for the life of such as you."

Since the section here involved was enacted in 1909, and the so-called indeterminate sentence law in 1913, the legislature has met fifteen times, and have not seen fit to make changes in either. Furthermore, in 1933, the legislature at the same time re-enacted both sections. And since they are in harmony, sound in reason, and logical in action, I can see no reason why we should take out of them what the legislature put in, or read into them what the legislative assembly left out. To do so is to invite assaults, disorder and difficulties in discipline, and increase the danger to the employees at the prison. I see no sound way of escaping from the conclusion that a convict serving a sentence under which he can be kept in prison for life is "undergoing a life sentence" and subject to the death penalty for violation of section 103-7-12, U. C. A. 1943.

Because I think the opinion of my associates in error on these two points, I dissent. I think the judgment should be affirmed.

MOFFAT, J., participated in the hearing but died before the publication of the opinion.