## STATE v. SCOTT et al.

No. 6936. Decided January 6, 1947. (175 P. 2d 1016.)

10

See 35 C. J. S. False Pretenses, sec. 54; 22 Am. Jur. 483.

*Gustin & Richards,* of Salt Lake City, for appellants.

*Grover A. Giles,* Atty. Gen., *Herbert F. Smart,* Deputy Atty. Gen., and *Brigham E. Roberts,* Dist. Atty., of Salt Lake City, for respondent.

WOLFE, Justice.

Appellants appeal their conviction of the crime of obtaining money by means of a coin matching confidence game.

Chapt. 18 of Title 103, U. C. A. 1943, is entitled: "False Personation and Cheats." Section 16 thereof reads:

"Every person who obtains or attempts to obtain from any other person any money or property by any means, instrument or device commonly called a confidence game shall be imprisoned in the state prison not more than ten years."

The appellants were found guilty of the above offense, upon an information and bill of particulars which charge as follows:

### Information

"That the said Ernest Ray Scott, Wayne Meader, Charles L. Spencer and Louis Krevich, on the 2nd day of November, A. D. 1945, at the County of Salt Lake, State of Utah, did unlawfully and feloniously obtain from Lester Williams Scholes $110.00, the money of said Lester William Scholes, by means of and by use of a confidence game." (See Sec. 103-18-17 as to form.)

### Bill of Particulars

"That at the time and place alleged in the Information, the defendants engaged Lester William Scholes in a dollar matching game, and in connection therewith induced the said Lester William Scholes to entrust $110.00 with them, the said defendants at such time intending to take said money and to appropriate it to the use of themselves, and the said defendants did not return said money but appropriated the same to their own use."

Defendant Krevich forfeited bail and failed to appear for trial. He is not an appellant before this court.

The appellants moved to quash the information upon the ground that the bill of particulars did not constitute the offense charged in the information. They also demanded a further bill of particulars to clarify uncertainties as they believed them to exist.

Their appeal is before this court upon 33 assignments of error raising questions of the sufficiency of the pleadings, the sufficiency of the evidence, and the admissibility of evidence.

In brief the facts are these: Krevich struck up an acquaintanceship with Scholes in a bus station. Scholes invited Krevich to have a drink. They left the bus station together and went to a saloon not far distant. Krevich offered to pay for the drinks as Scholes did not have any small change, but had a roll of bills totalling about $110.00. Krevich suggested they go to another saloon, as he thought the beer was better there. As they proceeded ostensibly for the other saloon, Spencer stepped up to them and made inquiry as to the location of the "Sweeny Hotel." Scholes and Krevich stated they were not familiar with its location. Spencer told of troubles with a girl with whom he had entrusted $20.00, and that he was so angry he had lost his way. Krevich invited him to have a drink with them. Spencer said he did not care for a drink, but would like some cigars. Krevich suggested they match dollars to see who should pay for the cigars. They matched and Krevich won. Scholes did not participate in this matching. Spencer asked for the opportunity to win his dollar back. They matched again. Krevich won again. Scholes did not participate in this matching either. Spencer wanted to try it again, if Scholes would get in. Krevich said to Spencer:

"What kind of a sport are you—we [referring to Scholes and himself] will match for $20.00."

The three matched and Krevich won. Spencer and Scholes each paid him $20.00. Krevich slipped Scholes' $20.00 back to him. This act was seen by Spencer. He wanted to know

if the other two were playing a game on him. They denied this, and Scholes again handed his $20.00 to Krevich. Spencer then told of some $5000.00 he had in his shoe that was hurting his foot. He stopped ostensibly to fix it, and Krevich handed Scholes a penny to hold heads up if Spencer returned and wanted to match again. Spencer came back and said he didn't want to be outdone by Yankies and would match again. Krevich wanted to know if he would match for $500.00. Spencer agreed. They matched. Krevich won. Spencer paid him five one hundred dollar bills, and, as Scholes paid nothing, Spencer made inquiry as to why. The result was that Scholes paid Krevich the balance of his $110.00 roll, and was to owe Krevich $410.00. This was the suggestion made by Krevich to Spencer, upon the theory that Scholes was a friend of Krevich and could be trusted. Spencer left, and Krevich told Scholes to go back to the bus station and they (he and Krevich) would divide the money up and Scholes could have his back. Krevich left. Spencer returned, still questioning Scholes about the transaction. Then Spencer and Scholes separated. Scholes never got to the bus station, as he was arrested by police officers. The police officers also followed Spencer and saw him again contact Krevich and the two of them walk together toward town.

Scott and Meader are brought into the picture this way: The officers of the Salt Lake City police force, becoming suspicious of the actions of these men and two others, had been watching them for several days. What they had seen was this: One or the other of the group would enter the bus station. He would reappear with some stranger. The two would move off down the street. Another defendant would contact them. There would be conversations, then the three would continue on together. In describing these scenes the officers indicated, by illustration, that the parties went through the motions of matching coins. The two who contacted the stranger were not always the same. One or two who were not acting as contact men were usually in the neighborhood, moving and stopping to keep the contact

men and the stranger in view. The officers described the actions of these latter as if they were not only keeping watch on the contact men and the stranger, but were keeping watch on others in the locality. In the incident involving Scholes, Meader was some distance behind the three, keeping watch on them, while Scott was in an automobile across the street, keeping pace with the group.

1. Does the bill of particulars support the information? The gist of the bill of particulars is that defendants "induced" Scholes "to entrust $110.00 with them." The word "confidence" is not used, but to induce one to entrust money to another implies a confidence in the latter that the former will care for, use, or dispose of the money as intended. (See Webster's definition of "entrust".) The vehicle or means of obtaining that confidence in this case is alleged to be "a dollar matching game." The fact that the dollar matching game is gambling does not defeat the idea conveyed by the bill of particulars that Scholes' loss was not merely a gambling loss—that his loss was due to his belief, arising out of the dollar matching game, that his money would be used as contemplated. There was something more than a mere gamble charged by the information and bill of particulars. The following quotation taken from *People* v. *Snyder*, 327 Ill. 402, 158 N. E. 677, 678, 56 A. L. R. 722, is the foundation for appellants' attack upon the pleadings in this case:

"Where the property is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and then abusing the confidence so obtained, a conviction for the confidence game cannot stand."

However, as indicated above, the pleadings here charge more than a loss of $110.00 by gambling. The Bill of Particulars definitely states that the defendants *"in connection with"* a dollar matching game "induced Lester William Scholes to entrust $110.00 to them."

2. Appellants in their request for further bill of particulars, in effect, set out six reasons why the bill of

particulars was insufficient to enable them to prepare their defense. How much detail is properly required to inform appellants of the offense with which they are charged? To clarify the six grounds of doubt, propounded by appellants, calls for nearly as much, if not as much detail as appears in this opinion under the statement of facts. It is not the function of the information and the bill of particulars to lay in the lap of the accused the evidence for the prosecution. Appellants were informed of the time, of the place, of the parties involved, and also of the nature of the offense as being the use of a dollar matching game to gain Scholes' confidence, the obtaining of his money by such means and their intention to appropriate that money to their own use, plus that appropriation. There is nothing in those details that needs greater particularization to indicate the nature of the offense. Coin matching is so commonly understood it needs no definition. There may be various ways that coin matching would have the desired psychological effect upon the alleged victim. In the present case, the evidence shows that Scholes' cupidity cast out his caution. It is certainly not incumbent upon the prosecution to set out facts that would give the measure of the alleged victim's gullibility. "Confidence game" as used in this alleged offense, is defined in the bill of particulars as a dollar matching game, used to gain Scholes' confidence. Whether is was hard or easy to gain that confidence is a detail that adds nothing to the definition of the game. It is the dollar matching game plus its use to allay Scholes' suspicions, if any he might have had at the time, that is important as notice to appellants of the offense they must meet. The bill of particulars is sufficient to support the information.

3. The lower court instructed the jury as follows:

"You are instructed that if you find from the evidence that Lester William Scholes voluntarily parted with his money to the defendant Krevich, with the understanding that he, the said Scholes was later to meet Krevich and there and then have returned to him his money or more, and such meeting or plan between Scholes and Krevich was interrupted or was not carried out by reason of something not directly

attributable to Krevich, you must return a verdict in favor of all three of the defendants of not guilty."

Whether or not this was an erroneous instruction is not in issue. What appellants do claim for it is this: It became the law of the case and was binding upon the jury. Furthermore, they contend that as Scholes was arrested before he got to the alleged meeting place—the bus █ station—the plan of Krevich and Scholes was not carried out by "reason of something not directly attributable to Krevich." It is fair to say that Scholes' arrest was not directly attributable to Krevich, but is it fair to say that the jury could arrive at but one other conclusion, to wit, that such arrest was the cause of the failure of the plan of the two? There is nothing in the instruction which would limit the jury to that conclusion. They might legitimately conclude that the promise to meet at the bus station was a promise Krevich did not intend keeping at all. By such reasoning they might well treat Scholes' arrest as immaterial. The jury was the interpreter of the actions of the parties, and the court had no power to, nor did he attempt to dictate what that interpretation should be.

Another instruction given by the lower court, Instruction No. 15, reads:

"You are instructed that in arriving at your verdict in connection with each of the three defendants appearing in this action, you must consider each defendant separately, and unless you find that there is evidence beyond a reasonable doubt that the particular defendant you are considering was actively participating or aiding and abetting in the commission of the alleged crime, if you find a crime was committed, you must find that defendant not guilty. Mere acquaintanceship or association in and of itself, is not sufficient to warrant you in convicting the defendant against whom nothing more is shown."

Appellants maintain that there was nothing to show that Meader or Scott aided, abetted or actively participated in the commission of the offense. No doubt it will be conceded that if the proof supports a conclusion that either Meader or Scott was acting as a "lookout" or "get-away man," he

was aiding in the commission of the offense. The real question on this issue is that of the sufficiency of the evidence to connect these two to the offense. This will be discussed later.

4. Appellants contend that there was no corroborating evidence as required by Section 105-32-17, Utah Code Annotated 1943, which reads:

"Upon a trial for having obtained, with an intent to cheat or defraud another designedly by any false pretense, the signature of any person to a written instrument, or from any person any money, personal property or valuable thing, the defendant shall not be convicted, if the false pretense was expressed in language, unaccompanied by a false token or writing, unless the pretense or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proved by the testimony of two witnesses, or that of one witness and corroborating circumstances; but this section shall not apply to a prosecution for falsely representing or personating another, and in such assumed character marrying, or receiving any money or property."

We initiated this opinion by referring to the heading of Chapter 18 of Title 103 of our code. Under that heading are to be found, among others, various offenses of false impersonation; and offense of conveying property as a single man when married; one of issuing checks against insufficient funds; an offense of salting a mine; and one of changing ore samples. There is also included the offense of unlawful wearing and using insignia. Many of these offenses are in the nature of trickery and rely upon the falsity of the actions or characterizations involved more than they do upon false statements made. The chapter, however, also contains offenses founded upon false statements. For instance: 103-18-8, the offense of obtaining money by false representations, and 103-18-9, the obtaining of credit by false representations.

It is to be noted that Section 105-32-17, quoted above, says that there must be two witnesses to the false pretense, or there must be corroborating evidence—when? When the "false pretense" is

"Expressed in language, unaccompanied by a false token or writing, subscribed by or in the handwriting of the defendant."

This is followed by a clause excluding the offenses covered by section 103-18-2 (marrying under false personation) and 103-18-4 (acquiring property under false personation). Obviously section 105-32-17 refers generally to the offense covered by Chapter 18 of Title 103—but does it refer to each of them? We conclude not. Two are specifically excluded; others are of necessity excluded, as they are not founded upon

"Language, unaccompanied by a false token or writing, subscribed by or in the handwriting of the defendant."

For instance, section 103-18-12 (Salting a mine) ; or 103-18-15 (unlawfulling wearing or using insignia). What about the confidence game in this appeal?

The offense as developed here is in the nature of trickery, rather than language involving false representations. A confidence game can be founded upon false representations. See 22 Am. Jur. 482, sec. 74. The false pretense in this case, however, was more in actions than in words. The alleged offenders acted a scene that had the desired misleading effect upon Scholes. Little was said that could be considered any kind of a "language" misrepresentation. Except as to the promise to return Scholes' money, the latter was well aware of the falsity of such statements as were made that affected the manner of conducting the dollar matching game. Scholes thought Spencer was the victim. Instead he himself was caught. It is our opinion that the offense as charged in the present appeal is not one to which Section 105-32-17 has application.

5. Did the lower court err in the receipt of evidence?

(a) Was it error to admit evidence of actions of the defendants prior to the date of the offense charged?

As stated earlier in the opinion officers of the Salt Lake City police force, suspicious of the actions of these defendants and two other persons, watched them for several days.

They observed that one of the group (whom we shall hereafter refer to as the "No. 1" man) would enter the bus station. He would reappear with some stranger. The two would move off down the street. Another of the group (whom we shall call the "No. 2" man) would contact them. There would be conversations, then the three would continue on together. In describing these scenes the officers indicated, by illustration, that the parties went through the motions of matching coins. The two who contacted the stranger were not always the same. One or two of the defendants or their associates who were not acting as contact men were usually in the neighborhood moving and stopping to keep the contact men and the stranger in view. The officers said those defendants acted as if they were not only keeping watch on the contact men and stranger, but were keeping watch on others in the locality. These "lookout" men were sometimes in automobiles and sometimes on foot. The lookouts we shall call "No. 3" men.

The officers testified that during six days (the day of the Scholes' incident and the five days immediately preceding) that the defendants and their associates went through substantially the same activities with many other persons as they went through with Scholes. During those six days the defendants were frequently seen together or in groups of two or more and they acted as though they were well acquainted one with the other.

During that time defendant Scott played the part of the "No. 1" man three times, "No. 2" man five times, and "No. 3" man three times. Meader was "No. 1" man twice, "No. 2" man eight times, and "No. 3" man three times. Spencer was "No. 1" man once, "No. 2" man fifteen times, and "No. 3" man fifteen times. Krevich, the defendant who was not present at the trial and so was not tried, played "No. 1" man fifteen times, "No. 2" man three times, and "No. 3" man fifteen times.

In the Scholes incident Krevich was the "No. 1" man, Spencer was the "No. 2" man and Meader and Scott were "No. 3" men.

Defendants challenge the receipt of evidence as to these previous actions on the grounds that the acts were unrelated to the offense charged and were introduced solely to show bad character of the accused and their propensity to commit similar crimes.

In criminal cases the courts vary as to the exclusion of evidence of other offenses than that charged. In some jurisdictions the rule excludes such proof only when the relevancy of such evidence goes merely to the evil disposition of the accused. This is the rule adopted by the American Law Institute in its Model Code of Evidence, 1942, page 196, Rule 311. In other jurisdictions the rule is stated to be that evidence of other crimes than that charged against the accused is inadmissible with certain exceptions; some of which are: to prove intent, motive, absence of mistake or accident, the existence of a plan or scheme, or to prove the identity of the doer of the act. For a discussion of the history and development of these rules see two articles by Julius Stone entitled

"The Rule of Exclusion of Similar Fact Evidence," 46 Harvard Law Review 954 (1933) and 51 Harvard Law Review 988 (1938).

The basic rule of admissibility of evidence is that all evidence having probative value—that is, that tends to prove an issue, is admissible. In countries where the civil law prevails that is clearly recognized. But in the common law there were developed certain exceptions to that basic rule, for example, the hearsay rule, which made certain evidence, though relevant and material, incompetent. That was because of the danger of prejudice to the party against whom it was offered who would have no chance to cross-examine the source, or the probative value of the evidence offered was small as compared to the great prejudicial affect it might have. So-called "exceptions to the hearsay rule" are really not exceptions to the hearsay rule which is itself an exception to the basic rule of admissibility, but are in reality limitations on the hearsay exception. As to the admissibility of evi-

dence of prior offenses some courts (ours included as will be hereafter shown) have seemingly lost sight of the fact that the basic rule of admissibility of evidence was that all evidence having probative value was admissible, and instead appear to consider as the basic rule what is really an exception to the over-arching rule of admissibility; that is, the rule is announced as one where evidence of other crimes than that charged against the accused is inadmissible. Such courts then set up exceptions to that rule which render certain evidence of other crimes admissible.

The better analysis is that such evidence is admissible not because it comes under an exception to the rule of exclusion but that the rule of exclusion is sufficiently narrow that it does not apply to such evidence and the evidence is therefore admissible under the basic rule that all evidence having probative value is admissible.

As stated above the American Law Institute in its Model Code of Evidence approaches the matter from this latter direction. As to the rule regarding the admissibility of other offenses, it proposes as follows:

"Subject to Rule 306 [rule as to character evidence], evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible as tending to prove that he committed a crime or civil wrong on another occasion if, but only if, the evidence is relevant solely as tending to prove his disposition to commit such a crime or civil wrong or to commit crimes or civil wrongs generally." Model Code of Evidence, 1942, page 196, Rule 311.

The rule thus stated *limits* the rule which excludes evidence of other offenses rather than sets up a broad rule of exclusion subject, however, to many exceptions.

In this court's opinions the rule has been approached from both directions. Mr. Justice Wade in his opinion in *State* v. *Nemier,* 106 Utah 307, 148 P. 2d 327, discusses the problem and relying on the early case of *People* v. *Coughlin,* 13 Utah 58, 44 P. 94, considers the rule to be that in criminal cases evidence of other crimes is admissible unless it is relevant solely to show propensity to commit crime. This is the rule as proposed by the American Law Institute.

On the other hand, our latest decision involving the question was *State* v. *Peterson*, 110 Utah 413, 174 P. 2d 843, which, citing *State* v. *Kappas*, 100 Utah 274, 114 P. 2d 205, announces the rule to be a broad rule of exclusion subject to many exceptions. That is the way the rule is stated in most of the Utah cases where it has been involved. *State* v. *Pollock*, 102 Utah 587, 129 P. 2d 554; *State* v. *Kappas*, 100 Utah 274, 114 P. 2d 205; *State* v. *Anderton*, 81 Utah 320, 17 P. 2d 917; *State* v. *McGowan*, 66 Utah 223, 241 P. 314; *State* v. *Bowen*, 43 Utah 111, 134 P. 623. Exceptions which are mentioned in the cited cases are: if the evidence tends to show intent or motive, if it indicates the offense was not due to accident or mistake, to show a general plan, to show "all relative facts and circumstances which tend to establish constitutive elements of the crime" of which the defendant is charged. The number and limit of the exceptions have not been set—perhaps they are so numerous and so broad that the general rule is cut away until it, in effect, excludes only evidence which is relevant solely to show the evil disposition of the defendant. If such is the extent of the exceptions the rule as announced in these cases is the same in effect as the rule espoused by the American Law Institute in its Model Code of Evidence.

We think that the better statement of the rule is that suggested in Mr. Wade's opinion in *State* v. *Nemier*, supra, and which is Rule 311 of the Model Code of Evidence quoted above. We, therefore, adopt the rule as thus stated to be the law of this state.

The evidence in this case as to prior acts of the defendants was relevant to the issues of the case for other purposes than merely to show the defendants' disposition to commit crime. The evidence shows that all the defendants were acquainted with each other and that together they had gone through the same performance with many other persons as they went through with Scholes. Such evidence tends to establish that in the Scholes incident the defendants were acting according to a predetermined plan and that Scott and Meader were playing set

rules of the scheme though they were some distance from Scholes and Krevich and Spencer.

The evidence of prior actions of the defendants was admissible to show the defendants were acquainted with each other and to show a general scheme of operation and the participants therein.

(b) Defendants attack the admission of conversations between Krevich and Scholes and conversations between Scholes, Krevich and Spencer as evidence against the defendants who were not present at such conversations.

This evidence was admitted on the theory that there was a plan or scheme among the four defendants charged. Defendants contend no plan or scheme was shown and therefore the evidence was inadmissible against the defendants who were not present at same. As indicated above the evidence of actions of the defendants prior to the offense charged was admissible. A jury from that evidence and evidence of their actions in the incident charged could have been convinced beyond a reasonable doubt that the defendants were acting together in the Scholes incident and were acting according to a prior agreement. As there is sufficient evidence to show an agreement each defendant was the agent of all the others in making any statement or doing any act to carry out that agreement. *State* v. *Erwin,* 101 Utah 365, 120 P. 2d 285.

The trial court did not err in admitting evidence of conversations between one or more of the defendants and Scholes as evidence against all the defendants.

We have considered the other questions raised by defendants' assignments of error and find in them no reason for reversing the judgment.

The judgment is affirmed.

McDONOUGH, PRATT, and WADE, JJ., concur.

LARSON, Chief Justice (concurring-dissenting in part).

I concur in the result. There are some statements in the opinion which I think carry implications in which I cannot

concur. Thus in paragraph numbered 3, in discussing an instruction the opinion reads:

"They [the jury] might legitimately conclude that the promise to meet at the bus station was a promise Krevich *did not intend keeping* at all. By such reasoning they might well treat Scholes' arrest as immaterial." (Italics mine.)

If Krevich did not intend to keep the promise when he made it, yet if he actually did keep it by going to the bus station at the appointed time, and when he went there he did not know of Scholes' arrest, the jury could not legitimately draw conclusions against defendants as implied in the language used in the opinion. But on the evidence the jury might find that Krevich *did not go* to the bus station to meet Scholes, as he had promised; and that Krevich did not know of Scholes' arrest, and therefore the arrest of Scholes was not the cause of Krevich not going to the bus station to meet Scholes, then the jury might treat the arrest of Scholes as immaterial, and conclude that as far as defendants were concerned, the meeting plan between Krevich and Scholes was not carried out "by reason of something directly attributable to Krevich."

In the discussion under point numbered 4 in the opinion it is held that the offense involved in this action is not one to which section 105-32-17 has application. I see no reason for such holding. I think this case comes clearly within the statute, as one where the pretense is proved *by one witness and corroborating circumstances*. I therefore dissent from that holding that this offense is not one to which Section 105-32-17 has application. This difference of opinion does not affect the result in the case. Therefor, in this dissent it could serve no useful purpose to review the record.