## STATE v. MICHAEL GOBLIRSCH.

246 N. W. 2d 12.

July 23, 1976—No. 45964.

*Blethen, Ogle, Gage & Krause* and *Bailey W. Blethen,* for appellant.

*Warren Spannaus,* Attorney General, *Richard G. Mark,* Assistant Solicitor General, and *Thomas J. Foley* and *Edward M.*

*Laine,* Special Assistant Attorneys General, and *John F. Corbey,* County Attorney, for respondent.

Heard before Rogosheske, Todd, and Breunig, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

Defendant appeals from the judgment entered pursuant to a jury verdict finding him guilty of manslaughter in the first degree, Minn. St. 609.20(2), in the death of his 2-month-old daughter and from the denial of his post-trial motions. He principally asserts that (1) there was insufficient evidence to support the jury's implicit finding that he intentionally assaulted this infant and caused her death; (2) the permitted use of the phrase "battered child syndrome" was prejudicial error; and (3) the trial court erred in refusing to admit polygraph evidence secured and offered by defendant tending to establish his credibility. We conclude there is sufficient supporting evidence, find no error, and accordingly affirm.

Defendant and his wife, Janice, were the parents of the deceased infant, Julie Goblirsch, who was born on September 22, 1974. The Goblirsches were married about 2 years prior to the infant's birth, and she was their first and only child.

At the time of the infant's death, Janice Goblirsch was working a 5-day week from 8 a. m. to 5 p. m. Defendant took care of Julie while Mrs. Goblirsch worked. From Monday morning until the time she was brought to the Mankato Clinic on Wednesday, November 20, 1974, defendant and his wife had exclusive custody of the child. At the time of the infant's death, defendant was 24 years old and was recuperating from surgery necessitated by a hip injury arising out of an automobile accident. Due to this injury, defendant was unemployed and recuperating at home throughout the entire 2-month period of the infant's lifetime.

At approximately 6 a. m. on November 20, Janice Goblirsch was awake while defendant was still sleeping. She went into the infant's separate bedroom and observed that her breathing seemed "abnormal." She woke her husband and both observed

this condition and the fact that the child "didn't seem to want to wake [up]." At 8 a. m., when they determined the child's condition was not improving, they decided to seek medical advice. Defendant said he had awakened and fed the infant at 3 a. m. as usual. According to defendant, she was "[p]erfect at that time." Around 5 a. m., defendant woke again when the child began "screaming, bawling like crazy." Defendant acknowledged to his wife that while attending the infant that morning he had accidentally hit her head on the crib. Mrs. Goblirsch testified that she heard the child's head bump the crib at 5 a. m. The infant was brought to the Mankato Cinic by defendant at 8 a. m.

Dr. Donald Swenson, a pediatrician, examined the infant following her arrival at the Mankato Clinic. He noticed that she had bruises on her cheek and jawbone area and asked defendant how she had received them. Defendant stated that she had been picked up in the night and bumped a toy that was on the crib. The infant's fontanelle, or soft spot, was markedly bulging and tense, and the doctor also noticed a small scar and some abrasions. Dr. Swenson directed that she be taken to the hospital, where he again examined her. A spinal tap revealed bloody spinal fluid which indicated hemorrhaging somewhere between the brain and the point of the tap.

Dr. Swenson then performed a subdural tap which revealed blood. Since the doctor testified that a subdural hematoma caused by infection does not usually have blood in it, the presence of blood suggested trauma. A chest X-ray revealed irregular, healing fractures of several ribs. Dr. Swenson diagnosed the multiple injuries as probably being due to "battered child syndrome." Additionally, Dr. Swenson testified that the onset of the cerebral hemorrhage was very recent, "a matter of minutes to hours." He did not believe that hitting the crib could have caused the injury, nor that the injuries were accidental because of the inconsistent history which was given and the multiple injuries and evidence of multiple times of injury. Finally, Dr. Swenson testified that the infant's pattern of weight gain was not normal.

Margaret Baker, a nurse in Mankato, admitted the infant to the hospital and elicited a history from defendant. She testified that defendant told her that he bumped the infant's head on the crib, and that he may have bruised the infant's chin while feeding her.

The infant was subsequently taken to the University of Minnesota Hospitals by a special transport team. She arrived there about 6 p. m. on November 20, 1974, and was attended by Doctors Carl Hunt and John Barranger. She died 2 days later. Both doctors testified that the infant's head injury was not accidental and could not have been inflicted upon the infant by herself. Dr. Barranger testified that the brain hemorrhage was probably caused by a traumatic injury of considerable force.

Dr. William Anderson, a pathologist who examined the infant after she died, testified that the brain injury, the external bruises, and the 13 fractures of her ribs which were then revealed were consistent with trauma, and that subdural hemorrhages and cerebral edema were the cause of death. Dr. Barranger testified that the size of the zones of recalcification on the infant's ribs indicated that the fractures were between 1 and 3 weeks old. Dr. Homer Venters, chief of the Department of Pediatrics at St. Paul-Ramsey Hospital in St. Paul, concurred with the opinion of the other doctors that the infant's injuries were not accidental in nature but instead indicative of the battered child syndrome.

Defendant testified at trial and denied ever intentionally injuring or abusing the infant in any way. Defendant's wife testified that she did not believe that defendant had intentionally harmed their child in any way. She also denied, as did defendant, being aware of any accident or serious trauma to the infant prior to the morning of November 20 when her breathing became abnormal. Also, neither parent had any explanation for, or claimed any knowledge about, the infant's multiple rib fractures.

Defendant testified that he handled the regular night feeding at 3 a. m. on November 20 without incident and left the baby

sleeping on her stomach at that time. He stated that at about 5 a. m. she started to cry again and this was an unusual time for her to wake up. Defendant got up to attend her, went into her room, and lifted her out of the crib. In the process, defendant testified that the baby might have hit the crib mobile that was attached to the crib and that her head did hit the side of the crib. He saw no injury on her head and did not feel the incident was significant. He put her back down on her back, and because she then seemed to calm down, he returned to bed and to sleep. Defendant was next wakened at 6 a. m. when his wife discovered the baby's abnormal breathing.

The jury, after hearing all of the above testimony and assessing its credibility, returned a verdict finding defendant guilty of first-degree manslaughter for an assault upon the infant with such force and violence that death or great bodily harm was reasonably foreseeable.

Upon appeal, the evidence must be viewed in the light most favorable to the verdict. State v. Ellingson, 283 Minn. 208, 167 N. W. 2d 55 (1969). In State v. Loss, 295 Minn. 271, 280, 204 N. W. 2d 404, 409 (1973), this court recognized that, due to the fact there are rarely eyewitnesses to child abuse, it "is very difficult in these prosecutions * * * to establish the guilt of a defendant other than by circumstantial evidence." Defendant argues that the evidence here was inadequate to support the jury's verdict because (1) it was not conclusively shown that he was the sole person with custody of the child at the time of the fatal injury, and (2) no psychological evidence was offered showing that defendant had the personality of a battering parent. Defendant begins by comparing the circumstantial evidence in State v. Loss, *supra*, with that present here, contends that the evidence of guilt was stronger in Loss, and concludes that the evidence here was insufficient to support a verdict of guilty. While the evidence here is on balance less conclusive than that adduced in Loss, this fact by no means warrants an appellate conclusion that the evidence is inadequate.

The unrefuted consensus of the examining doctors was that the head injury was not accidental and occurred sometime within 24 hours of the infant's arrival in Dr. Swenson's office. During this time she had been in the sole custody of both her parents. Dr. Swenson testified the head injury was very recent—"a matter of minutes to hours" before her arrival in his office. During the crucial early morning hours of November 20, she was attended to solely by defendant. Since the medical evidence indicated strongly that it was during this period that the fatal, nonaccidental, and traumatic head injury occurred, and since other circumstantial evidence—including defendant's testimony, the mother's absences due to work, and the mother's inability to offer an explanation for any of the injuries—reasonably supports an inference of defendant's guilt, the jury was justified in reaching the verdict it did.

Defendant's contention that the verdict must be reversed due to the absence of psychological evidence that he was a battering parent is also without merit. In State v. Loss, *supra*, such evidence was admitted, but we did not hold there that testimony regarding the battered child syndrome is inadmissible where unaccompanied by a profile of the battering parent. See, State v. Best, 232 N. W. 2d 447, 458 (S. D. 1975). Evidence that defendant's behavior is consistent with the profile of a battering parent is relevant, but not indispensable, in establishing guilt.[1]

Defendant next argues that the use of the phrase "battered child syndrome" by the testifying doctors, permitted by the court over his objection, was prejudicial error because it was inflammatory and no foundation had been laid that defendant was the battering parent. The phrase "battered child syndrome" is a widely recognized medical diagnosis which indicates that a child has been injured by other than accidental means. See, State v. Loss, *supra*; McCoid, *The Battered Child and Other Assaults Upon the Family: Part One*, 50 Minn. L. Rev. 1; Minn. St.

---

[1] Defendant was successful in persuading the trial court to prohibit use of the medical term "battering parent" in the presence of the jury.

626.554, subd. 1. Although the phrase has an accusatory connotation, it is intended to indicate only that the child was not injured accidentally and does not constitute an opinion as to whether any particular person injured the child. See, People v. Jackson, 18 Cal. App. 3d 504, 507, 95 Cal. Rptr. 919, 921 (1971); People v. Henson, 33 N. Y. 2d 63, 74, 304 N. E. 2d 358, 364 (1973). Its use in this case was potentially no more prejudicial than the revolting nature of the infant's injuries themselves, as the physical evidence of her extraordinary injuries shows and the unanimous opinion of the testifying doctors was that they were not caused accidentally. The trial judge was painstaking in guarding against this potential prejudice through efforts to ensure that the jury understood the critical question to be whether defendant was the person who caused the fatal injury. The jury doubtless resolved this last question by reference to all other evidence in the case.

Defendant offered to submit to a state-administered polygraph test, which the prosecution declined. At trial, he offered to prove that a polygraph examination by an expert employed by him revealed that he was telling the truth when he stated that he did not intentionally injure the infant. The trial court refused to admit this evidence because of prior decisions of this court holding polygraph evidence inadmissible in criminal trials. State v. Simonson, 298 Minn. 235, 214 N. W. 2d 679 (1974); State v. Perry, 274 Minn. 1, 142 N. W. 2d 573 (1966); State v. Kolander, 236 Minn. 209, 52 N. W. 2d 458 (1952). Defendant urges that this court now reconsider the rule of inadmissibility set down in these earlier cases. We decline to do so in this case because of the prosecution's nonparticipation, and because we are not persuaded that the reliability of polygraph evidence has improved sufficiently in recent years to warrant reversing these prior decisions or questioning their rationale.

We have carefully considered the other issues raised by defendant and find them to be without merit.

Affirmed.

MR. CHIEF JUSTICE SHERAN took no part in the consideration or decision of this case.