STATE of Utah, Plaintiff and Respondent,

v.

Kathy TANNER, Defendant and Appellant.

No. 17752.

Supreme Court of Utah.

Nov. 15, 1983.

**540**

Brooke Wells, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

The defendant and appellant, Kathy Tanner, appeals from her conviction for manslaughter in the death of her three-year-old daughter. The defendant was tried before the court and sentenced to an indeterminate term of not less than one or more than fifteen years in prison. The defendant here argues that there was insufficient evidence to support the verdict, that some evidence was erroneously admitted, and that some evidence was erroneously excluded.

The key evidence in this case is the mute testimony of the body of three-year-old Tawnya Tanner. There is no question that she died on March 21, 1980, of "subdural hematoma associated with multiple contusions of the body," as stated in the autopsy report. That report, the contents of which were stipulated to by the defendant, enumerated the many contusions scattered over the child's body literally from head to foot. The contusions are clearly visible in the photographs admitted in evidence, as are the bulges of the scalp where the severely bruised brain protruded through the craniotomy sites. At trial the court permitted the prosecution's medical experts to testify regarding the condition of the child's body, the nature of the injuries and the cause of death. This testimony included the witnesses' observations regarding the "battered child syndrome." The defendant claims error in the admission of this battered child syndrome testimony and the admission of instances of prior bad acts that she alleges were presented "to establish that Tawnya was a victim of the Battered Child Syndrome."

The issue of the admissibility of "battered child syndrome" testimony has not previously been presented to this Court.[1] The development of the medical-social concept of the battered child syndrome is traced in McCoid, "The Battered Child & Other Assaults Upon the Family: Part One" 50 Minn.L.Rev. 1 (1965). The author points out that the "development of the concept of the battered child syndrome has moved from an initial identification of physical phenomenon [sic] to concern with the causative factors outside of the body of the

---

1. In *State v. John,* Utah, 586 P.2d 410 (1978), the State Medical Examiner who performed the autopsy gave his opinion that the child was a victim of the "battered child syndrome," but the admissibility of that expert opinion was not directly addressed.

child." *Id.* at 19. Early publications concentrated on the identification of the pattern of injuries observed, but in the 1950s, articles began to address the origins of the trauma, including the role of the parents. Increasingly, as attention and research focused on the problem and statistics were assembled, the medical profession became aware of the abusive character of the injuries and the grave danger to the helpless child in the custody of an abusive caretaker. *Id.* at 4–8. McCoid summarizes:

From this review, it appears that by early 1965, there had come a recognition of a distinctive phenomenon called "the battered child syndrome" which, though it begins with a pattern of injuries to the child, is really descriptive of a pattern of conduct on the part of the parents or others who are to guard the welfare of the child. The medical description can perhaps best be summarized as multiple injuries in various stages of healing, primarily to the long bones and soft tissues and frequently coupled with poor hygiene and malnutrition, but peculiarly identified by the marked discrepancy between the clinical or physical findings and the historical data provided by the parents. Described in terms of the conduct of the parents or their characteristics, the studies seem to confirm that the abuser is likely to be an emotionally immature individual from almost any walk or stratum of society, a person who probably suffers from the pressures of marital difficulties or economic circumstances or other emotional pressures not directly related to the child himself, so that the child becomes merely a focus for generalized frustration or anger and an outlet for the poorly controlled aggressiveness of the parent.

*Id.* at 18–19.

Over the past fifteen years, cases discussing the use of battered child syndrome

evidence have appeared with increasing frequency in the state reporters. The battered child syndrome has become a well-recognized medical diagnosis, which must be testified to by an expert witness:

The diagnosis is dependent on inferences, not a matter of common knowledge, but within the area of expertise of physicians whose familiarity with numerous instances of injuries accidentally caused qualifies them to express with reasonable probability that a particular injury or group of injuries to a child is not accidental or is not consistent with the explanation offered therefor but is instead the result of physical abuse by a person of mature strength.

*State v. Mulder*, 29 Wash.App. 513, 629 P.2d 462, 463 (1981). In *People v. Jackson*, 18 Cal.App.3d 504, 95 Cal.Rptr. 919 (1971), the court pointed out that "[a]n expert medical witness may give his opinion as to the means used to inflict a particular injury, based on his deduction from the appearance of the injury itself." *Id.* at 507, 95 Cal.Rptr. at 921. Such testimony is not accusatory, but only indicates the cause of death. Similarly, when an expert testifies as to the existence of the "battered child syndrome," he expresses no opinion regarding a defendant's culpability, but rather testifies that, as the witness in *Jackson* stated:

"[I]t would take thousands of children to have the severity and number and degree of injuries that this child had over the span of time that we had" by accidental means. In other words, the "battered child syndrome" simply indicates that a child found with the type of injuries outlined above has not suffered those injuries by accidental means. This conclusion is based upon an extensive study of the subject by medical science.

*Id.*[2] In *Bludsworth v. State*, Nev., 646 P.2d 558 (1982), the defendants argued that

---

**2.** The *Jackson* opinion continues:

The additional finding that the injuries were probably occasioned by someone who is ostensibly caring for the child is simply a conclusion based upon logic and reason. Only someone regularly "caring" for the child has

the continuing opportunity to inflict these types of injuries; an isolated contact with a vicious stranger would not result in this pattern of successive injuries stretching through several months.

evidence of bruises and a bite mark on the body of the child was incompetent because there was no prior establishment that either defendant was responsible for the injuries. The court affirmed the admission of the evidence, stating:

Admissibility of the bite mark and other bruise evidence does not depend on connecting either defendant to the infliction of the injury. It is independent, relevant circumstantial evidence tending to show that the child was intentionally, rather than accidentally, injured on the day in question.

*Id.* at 559. In *People v. DeJesus*, 71 Ill. App.3d 235, 27 Ill.Dec. 448, 389 N.E.2d 260 (1979), the defendant claimed error in the use of battered child syndrome evidence, arguing that it suggested to the jury that the defendant was guilty of prior offenses. The court held that the expert's diagnosis and explanation of medical terms of art do not indicate wrongdoing on the part of a particular defendant, but merely describe the nature of the injuries. *See also State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978); *State v. Goblirsch*, 309 Minn. 401, 246 N.W.2d 12 (1976).

The defendants in these cases frequently argue that evidence of injuries other than that which is the immediate cause of death, i.e., any evidence of the battered child syndrome, is incompetent or is more prejudicial than probative. Again, we emphasize that evidence regarding the child's physical condition does not directly indicate the culpability of any particular defendant. In *Ashford v. State*, Okl.Crim., 603 P.2d 1162 (1979), an 8-month-old baby was found to have injuries from five days to two weeks old and partially healed fractures from four to eight weeks old, in addition to a fatal subdural hemorrhage. The court held that "[i]n a case of this nature, the past injuries are admissible to counter any claim that the latest injury happened through accident or simple negligence. *The pattern of abuse* is relevant to show the intent of the act." *Id.* at 1164 (emphasis added). In other words, the pattern of abuse is relevant to show that *someone* injured the child intentionally, rather than accidentally.

■ Battered child syndrome evidence is most frequently cited as admissible to show absence of accident. It is relevant to claims of accidents by the child, *e.g.,* "She was clumsy and fell a lot," as well as accidents by the adult, "I tripped while I was carrying him." Expert testimony as to types of injuries, their size, location and severity, together with evidence of their varying age and progress in healing, allows the lifeless or preverbal victim to testify in the only way possible. We are satisfied that the concept of the battered child syndrome is grounded in scientific research and is widely accepted in the medical community. Our research shows that all courts which have addressed the question have affirmed the admission of expert medical testimony regarding the presence of the battered child syndrome. We therefore conclude that in appropriate factual circumstances, testimony regarding the battered child syndrome is admissible when given by a properly qualified expert witness.[3] We caution trial courts to weigh

*Id.* at 507, 95 Cal.Rptr. at 921. That these inferences may be made from evidence of the battered child's condition does not militate against the use of the evidence. The finder of fact is entitled to make reasonable inferences from the evidence, as discussed *infra.*

**3.** The dissent apparently concludes that because of the resemblance between "battering parent syndrome" evidence and inadmissible character evidence, battered child syndrome evidence should be inadmissible also. We disagree. Other courts besides this one have distinguished between battering parent syndrome evidence and battered child syndrome evidence. In *State v. Loebach*, Minn., 310 N.W.2d 58 (1981), the

prosecution presented evidence which suggested that the defendant fit within the "battering parent" profile. For example, two witnesses from the defendant's past testified that the defendant had difficulty controlling his temper and was easily frustrated when a juvenile. The Minnesota Supreme Court held that evidence of the "battering parent" syndrome is inadmissible unless the defendant first raises the issue. The court stated that "this finding is required until further evidence of the scientific accuracy and reliability of syndrome or profile diagnosis can be established." *Id.* at 64. The use of "battered child syndrome" evidence in the case was not contested. *See State v. Goblirsch*, 309 Minn.

carefully the probative value against the potential for undue prejudice that may be created by the use of the term "battered child syndrome." The term should not be applied broadly or as a generalization. The expert should be able to testify in detail regarding the nature of the child's injuries and whether the explanation given for the injuries is reasonable. Any deficiencies in the testimony, however, go to its weight rather than to its admissibility. The weight and credibility to be given an expert's testimony are matters to be decided by the factfinder. Defense counsel may of course challenge the testimony on cross-examination, but such challenge goes to the weight to be given the testimony, not to its admissibility. *See State v. Clayton*, Utah, 646 P.2d 723, 726 (1982).

■ In the instant case, the testimony of four medical experts was presented by the State. The doctor on duty in the emergency room described Tawnya's condition as "moribund," in other words, a dying condition. He testified that the defendant told him that Tawnya fell, but that the explanation did not seem consistent with the severity of the child's condition. A neurosurgeon was the next to examine Tawnya. He testified that he found no spontaneous respiration, that Tawnya had dilated pupils with hemorrhages in the right eye indicating intercranial pressure, and that he observed one acute "relative fresh" bruise just ahead of the right ear, several new and old bruises on the face and an old bruise on the inner thigh. He further testified that he performed a bilateral craniotomy to relieve the pressure on the brain and that he found a very large subdural hematoma or blood clot with bruised brain tissue. He stated that the severity of the swelling and the hematoma indicated that a significant amount of force had been applied. Tawnya died the next morning, never having regained consciousness.

As already mentioned, the autopsy report stating that Tawnya died of "subdural hematoma associated with multiple contusions of the body" was stipulated to at trial. The medical examiner's expert opinion was that the multiple bruises on Tawnya's chin were not consistent with a single fall. The State's fourth expert, Dr. Palmer, based his opinion on his review of the police records, the autopsy report, the neurosurgeon's report, and his extensive experience as a pediatrician specializing in the study of child abuse. Dr. Palmer testified regarding the phenomena that alert a physician to the possibility of the battered child syndrome, such as: too many bruises and bruises in atypical locations considering the child's age; fractures, such as spiral fractures, of a type and severity not otherwise explained; severe head injuries not otherwise explained; and in general, a history of the trauma given by a caretaker that is inconsistent with the child's injuries. The doctor also testified that abusive disciplinary methods are frequently part of the battered child syndrome, that the parents of such children are typically very young or inexperienced and that they are likely to have a history of prior abusive conduct. Dr. Palmer went on to identify in Tawnya the characteristics of the battered child, emphasizing in particular the inadequate explanation given by the defendant for Tawnya's injuries. Counsel for the defendant took full advantage of the opportunity to challenge Dr. Palmer's opinions and the bases for his conclusions.

All four of the State's experts were properly qualified and testified within their areas of expertise. The term "battered child

---

401, 246 N.W.2d 12 (1976); *State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973). In *Sanders v. State*, 251 Ga. 70, 303 S.E.2d 13 (1983), the court also rejected the use of "battering parent syndrome" evidence. The Georgia court found that the expert testimony regarding the battering parent profile such as chronic stress or impulsiveness "clearly implicated [the defendant's] character." *Id.* at —, 303 S.E.2d at 18. Referring to the Loebach decision, the court

distinguished battering parent syndrome evidence from evidence of the "battered woman syndrome" and "battered child syndrome," which the court had previously held admissible in appropriate circumstances. *See Smith v. State*, 247 Ga. 612, 277 S.E.2d 678 (1981). In the instant case, as the defense did not raise the question of admissibility of battering parent syndrome evidence either at trial or on appeal, we do not address or decide that question here.

syndrome" was not used broadly, but was defined and applied to Tawnya with particularity. We therefore find that the trial court did not err by admitting testimony regarding the battered child syndrome.

■ The defendant also alleges error in the admission of testimony regarding specific instances of prior bad acts. She refers to Rule 47 of the Utah Rules of Evidence, which prohibits the use of evidence of specific conduct which tends to prove that a trait of the defendant's character is bad. She also cites Rule 55 of the Utah Rules of Evidence, which makes inadmissible evidence that the defendant committed a crime or civil wrong on a particular occasion for the purpose of inferring that the defendant committed a crime or wrong on another occasion. She alleges that evidence of prior bad acts was offered to establish the existence of the battered child syndrome. In this she is mistaken. The testimony regarding the battered child syndrome was based on the experts' observations of Tawnya's damaged body and was independent of evidence of the defendant's conduct.

The defendant also relies on Rules 47 and 55 of the Utah Rules of Evidence to contest the admission in evidence of specific instances of her prior conduct. This same allegation of error is raised in nearly all of the cases of a similar nature that we have reviewed. For example, in *State v. Tucker*, 181 Conn. 406, 435 A.2d 986 (1980), witnesses testified that they had seen the defendant abuse the 16-month-old victim, such as dropping the child from his bicycle, shaking him violently, causing him to fall out of his stroller and to hit his head, and slapping and hitting him. The defendant challenged the admission of the testimony as lacking probative value with regard to the intent to commit murder, and further argued that, even if probative, the evidence should have been excluded as prejudicial. The court held that the evidence was relevant to establish "a pattern of behavior and an attitude toward the child that is indicative of the defendant's state of mind." *Id.* at 415, 435 A.2d at 991. The court also

found the evidence admissible to show that the child's death was the result of an intentional act rather than an accidental act. In *People v. Henson*, 33 N.Y.2d 63, 304 N.E.2d 358, 349 N.Y.S.2d 657 (1973), the court held that evidence of the defendant parents' prior abusive acts was admissible to show absence of accident or mistake. The court stated that evidence of the battered child syndrome, together with other evidence such as the injuries having been caused while the child was in the parents' sole custody, permits the jury to infer that the child's injuries were not accidental and that the injuries were caused by the parents.

In the case before us, the defendant objects to the testimony regarding her treatment of Tawnya, alleging that its admission violated Rule 47 by attempting to prove a bad character trait with specific instances of conduct other than a conviction of a crime. She argues further that such evidence is not admissible as one of the exceptions under Rule 55, such as admissibility to show absence of mistake or accident, motive, opportunity, intent, plan, etc., because she did not raise the defense of accident or mistake. We agree with the courts in the *Tucker* and *Henson* decisions, *supra*, that such instances do tend to show that the crime charged was the result of intentional rather than accidental acts, but we find it unnecessary to base the admissibility of this evidence on whether or not the defendant has raised the defense of accident or mistake, or indeed, on any of the exceptions listed in Rule 55. In *State v. Forsyth*, Utah, 641 P.2d 1172 (1982), this Court pointed out that the word "including," which precedes the list of exceptions in Rule 55, "indicates that the list is illustrative, not exhaustive."

> Thus, Rule 55 provides that ... "other crime evidence" is admissible when relevant to prove *any* material fact, including those listed, but not including criminal disposition ....

*Id.* at 1175. The policy underlying Rule 55 is to assure that the criminal defendant is convicted of the crime charged and is to

protect him from conviction for being a person of criminal character. This policy is praised and promulgated everywhere, but the various formulations of the rule arising from the policy support a confusing body of case law. Historical research suggests that the original English rule, adopted in the United States, was very narrow in scope, excluding only evidence of acts that were relevant merely to disposition. *See* Stone, J., "The Rule of Exclusion of Similar Fact Evidence: America," 51 Harv.L.Rev. 988, 993 (1938). However, by the mid-nineteenth century, the admission of *any* evidence of other crimes or civil wrongs began to be described as anomalous, i.e., as an exception to a general rule of evidence excluding all such evidence. The original or inclusionary version directs the inquiry to relevance: if the evidence sought to be admitted is relevant and relevant to a matter other than the defendant's disposition, the evidence is admissible. The later exclusionary rule directs inquiry to the exceptions to the rule: if the evidence does not fit within a recognized exception, it is excluded. The exclusionary version of the rule is subject to abusive use in that it may prompt exclusion of clearly relevant evidence because of the difficulty in placing the evidence within an acceptable category, or it may be applied to admit evidence of questionable relevance merely because the evidence falls within a recognized exception. The application of the exclusionary version appears temptingly simple, but its mechanical use may in some circumstances deprive the defendant of the very protection that the underlying policy would provide, while in other circumstances it may impose an unnecessary and sometimes insurmountable burden on the State.[4] Many courts have observed that the more crimes or wrongs committed by a defendant, the more difficulty the prosecution may have in obtaining admissible evidence. *See, e.g.,*

*State v. Nemier*, 106 Utah 307, 148 P.2d 327 (1944).

Although this Court has at times cited both formulations of the rule, since *State v. Scott*, 111 Utah 9, 175 P.2d 1016 (1947), the Court has applied the inclusionary version. *See* Boyce, R., "Evidence of Other Crimes or Wrongdoing," 51 Utah B.J. 31 (1977). Rule 55 of the Utah Rules of Evidence, adopted in 1971, appears at first glance to be a recitation of the exclusionary version, with its list of exceptions. However, as we pointed out in *Forsyth, supra,* this effect is produced by the syntax. The substance of the rule is inclusionary: evidence of other crimes or civil wrongs that is competent and relevant to prove some material fact, *other than to show merely the general disposition of the defendant,* is admissible. The determination of relevancy is within the discretion of the trial judge.

▮ In cases of child abuse, such as the one before us, evidence of specific instances of the defendant's treatment of the child is relevant to establish not merely a general disposition for violence or ill-will towards all children, but to establish a specific pattern of behavior by the defendant toward one particular child, the victim. We distinguish this evidence of the defendant's conduct, relevant to establishing a pattern of behavior by the defendant, from evidence of the battered child syndrome given by experts that is relevant to establishing the nature of the injuries to the child and that is nonaccusatory and independently admissible, as discussed, *supra.* The two categories of evidence should, of course, be corroborative in order to support a conviction. This pattern of behavior by the defendant is relevant to establishing absence of accident or mistake (as held by numerous courts),[5] opportunity, knowledge or the

---

**4.** "The policy may evaporate through the interstices of the classification." McCormick (Handbook of the Law of Evidence, § 190 (2d ed. 1972)). McCormick argues persuasively for the exercise of discretion by the trial judge in place of a mechanical handling of this type of evidence.

**5.** In *McMichael v. State*, Nev., 577 P.2d 398 (1978), a sex crime case, the court held that intent and lack of mistake were put in issue by the defendant's plea of not guilty.

identity of the defendant as the person responsible for the crime charged.

We note that the courts of Nevada and Arizona have recognized that prior acts of sexual misconduct may be relevant to establish a "specific emotional propensity for sexual aberration." *State v. McDaniel,* 80 Ariz. 381, 388, 298 P.2d 798, 802 (1956). The evidence is limited to "proof of *similar acts near in time* to the offense charged." *State v. McFarlin,* 110 Ariz. 225, 228, 517 P.2d 87, 90 (1973) (emphasis added). *See also McMichael v. State,* 94 Nev. 184, 577 P.2d 398 (1978). Analogous reasoning is appropriate in a case such as this one where the presence of the battered child syndrome has been identified in the child. As previously noted (*see* McCoid, *supra*), the child abuser may be from any walk or stratum of society and not overtly remarkable in other ways. Medical research indicates that the child becomes the focus for the abuser's frustration or anger. Evidence of other violence or anger as, for example, abuse of other adults or inanimate objects, is too general to be relevant to the specific emotional propensity to abuse a child. While recognizing the relevance of specific instances of prior abuse, however, we refrain from specifying "specific emotional propensity" as a special category or exception to be added to the list contained in Rule 55. Such exceptions are subject to arbitrary and rigid use, as discussed above. The same danger exists in attempting to avoid Rule 55 by categorizing specific instances of prior abuse as habit or custom, under Rule 50. Although evidence of habit is far more specific than evidence of character and therefore less likely to be unduly prejudicial, complete avoidance of Rule 55 may lead to avoidance of the central consideration, i.e., relevance. *See* McCormick, *supra,* note 3, § 195. There is no substitute for a case-by-case inquiry into relevance.

■ Even when admissible as relevant, evidence of other crimes or civil wrongs may be excluded under Rule 45 if the trial judge finds that the probative value is substantially outweighed by the risk that its admission will consume unnecessary time, cause undue prejudice, or unfairly surprise a party. In order to preserve the policy underlying Rule 55 (conviction for commission of the crime charged and not for a criminal disposition), the judge must weigh not only the probative value of the evidence but also the *need* for the evidence and the *necessity* for a "full inquiry into the facts relating to the issues" against the potential for undue prejudice to the defendant. *State v. Lopez,* 22 Utah 2d 257, 262, 451 P.2d 772, 775 (1969). Where there is child abuse, there will invariably be secrecy. The great disparity of power and control between the abuser and the child assures that there will be little, if any, direct evidence. Even in cases where the victim survives, the child's age and vulnerability make it unlikely that he or she could be expected to testify competently. In these cases, it is probable that evidence of prior abusive conduct by a caretaker may be the only available link between the specific nature of the child's injuries and the caretaker who has offered either no explanation or an inadequate explanation for those injuries. However, we emphasize that the "reception of such evidence is justified by necessity and, if other evidence has substantially established the element of the crime involved (motive, intent, identity, absence of mistake, etc.), the probative value of showing another offense is diminished, and the trial court should rule it inadmissible even though relevant." *Tucker v. State,* 82 Nev. 127, 412 P.2d 970, 971 (1966).

■ In the instant case, the defendant told the doctors who treated Tawnya that the three-year-old had fallen off a slide at the park. She called her cousin while Tawnya was in surgery and related the same story, which she also told to two police officers. The defendant claimed that Tawnya was unconscious when she arrived home from work and that Leland Foote, with whom the defendant was living, told her that Tawnya had fallen from a slide earlier that day when Tawnya and her five-year-old brother, Brian, played there. Indeed, Foote originally told police officers

that when the two children returned from the park, Tawnya had a minor nosebleed and said that she had fallen. He claimed that she ate her lunch normally and watched television and that he later found her unconscious on the floor. Foote subsequently pled guilty to manslaughter and testified against the defendant,[6] relating that she disciplined Tawnya harshly, especially when Tawnya wet herself. He stated that on March 20, he and the defendant's two small children walked to the defendant's place of work to meet her and walk home with her, that Tawnya was lively and well,[7] that after returning to their apartment, he went into the bathroom where he heard two loud thumps as if something heavy had been thrown against the wall in the next room and that when he left the bathroom, he saw the defendant watching TV and he saw Tawnya lying unconscious on the floor. Foote related specific instances of the defendant's treatment of Tawnya, such as throwing her against a wall or the floor, kicking her, making her sit in a tub of cold water until the child could not stand, whipping her with a belt and rubbing the child's face in her messy pants. Additional witnesses—Foote's relatives, the defendant's relatives and the defendant's co-workers—corroborated this testimony by relating instances in which they personally saw the defendant abuse Tawnya or heard the defendant talk about disciplining Tawnya in ways they considered harsh. All of the incidents were personally observed by the witnesses, who were extensively cross-examined. The testimony was relevant not only to the absence of accident or mistake, as we noted above, but also to the defendant's pattern of behavior toward the victim. Where the presence of the battered child syndrome is shown in the child and the defendant is the child's caretaker, logic and the interests of justice demand as complete a story as possible concerning the crime and the surrounding circumstances. Medical testimony indicated that Tawnya's fatal injury was part of a pattern of abusive injuries. Evidence of the defendant's conduct during substantially all of Tawnya's life establishes an explanation for the many nonfatal injuries found on Tawnya's body. Professor Boyce comments that "in many instances evidence offered to complete the story of the crime also will establish identity, motive, scheme or plan or otherwise be admissible as bearing on a material fact in issue." Boyce, *supra* at 53. Such is the case here. This evidence, together with the defendant's lack of reasonable explanation for the injuries, is relevant to establish the identity of the one responsible for the fatal injury.

The defendant also objected to the admission of expert testimony regarding Tawnya's physical condition as an infant. Dr. Palmer's testimony was based on a report made by a physician who treated Tawnya at the Oregon Medical Center when Tawnya was three months old. Tawnya was admitted because of "failure to thrive," a

6. The defendant argues that Foote's guilty plea and his contradictory explanations of Tawnya's injury together cast such doubt upon his veracity as to make his testimony wholly incredible. The reasons for Foote's guilty plea are not found in the record before us. However, the court was made aware of the guilty plea and the possibility of bias in Foote's testimony during cross-examination by the defendant. The court was also aware of Foote's differing versions of the events on March 20, since both counsel questioned Foote regarding his reasons for changing his testimony. It is the duty of the finder of fact to weigh the testimony and determine its credibility. We assume that the court believed at least that portion of Foote's testimony which was corroborated by other witnesses. We will not interfere in the factfinder's determination regarding the credibility of the evidence.

*See Hall v. Anderson*, Utah, 562 P.2d 1250, 1251 (1977).

7. Several of the defendant's co-workers corroborated this testimony, testifying that at various times between 3:30 and 5:00 p.m., they saw the defendant leaving work with a man and a small boy and girl and walking along the street. An employee of a "Circle K" store testified that the defendant and Foote stopped by her store that afternoon on their way home. One of the defendant's co-workers specifically mentioned that she saw Tawnya skipping along. In the opinion of the medical experts, the force which produced the injuries seen at 8:00 p.m. that night would almost surely have caused immediate disability if not unconsciousness.

condition that may be caused by a variety of physiological problems or by neglect or abuse. After her admission, a routine x-ray revealed that Tawnya had sustained fractures of the right clavical, the right eleventh rib, the right tibia, and that she had an abnormality of the left humerus. He observed that two of the fractures were spiral fractures and stated that a self-inflicted spiral or tortion fracture is inconsistent with the degree of mobility possible for a three-month-old infant. He also noted that the parents' explanation of a fall from a couch was not sufficient to account for the injuries. Separate and apart from any evidence pertaining to the defendant's conduct, he testified that these physical symptoms were all indicators that would alert a physician to the possibility of the battered child syndrome. Although Dr. Palmer's testimony dealt only with Tawnya's physical condition and contained no accusatory statements regarding the defendant, this evidence is not relevant to Tawnya's condition at the time of her death, but rather is relevant to establishing a pattern of conduct by the defendant. The defendant points out that, although Tawnya was temporarily removed from her home as a result of this medical report, neither she nor Tawnya's father was ever prosecuted or convicted for any abuse of Tawnya. The defendant therefore argues that the evidence was admitted in violation of Rule 47 of the Utah Rules of Evidence, claiming that evidence of her prior bad acts (including the medical reports from Oregon) was "an attempt to show a bad, violent, and uncaring character" and was an inquiry into matters beyond the scope of the trial. We disagree. Where expert testimony has established the presence of the battered child syndrome in the victim, the pattern of conduct exhibited by the defendant-caretaker toward the child-victim is within the scope of the issues before the court. Specific instances of the defendant's prior acts were not admissible to show a generalized bad character, but to show the defendant's pattern of conduct toward Tawnya, specifically. The medical records are admissible, not because they fit within one of the exceptions included in Rule 55, but because the medical records are highly relevant to complete the whole history of the defendant's conduct toward Tawnya and because the records are reliable.

> The physician is undoubtedly a skilled observer of physical phenomena and is well equipped to determine whether the physical manifestations which he discovers square with the medical history given by the parents or the description of the events leading up to the present condition of the child.

McCoid, *supra* at 46. Medical records of the child's current or past condition that indicate either the presence or absence of abusive injuries must always be relevant to the issues at trial where, as here, expert testimony has established the presence of the battered child syndrome in the victim.

■ The question remains as to whether the trial court abused its discretion by admitting the evidence of the defendant's prior conduct under the standards set forth in Rule 45 of the Utah Rules of Evidence. As we have discussed above, child abuse is most likely to occur in the privacy of the home under circumstances that make the existence of direct evidence rare. In this case, the victim could not testify, and there were no competent witnesses to the crime. Under such circumstances, the admission of highly relevant evidence regarding the defendant's conduct toward the victim was justified by necessity and by the very specific nature of the evidence. It is questionable whether a three-year-old medical record standing alone, which strongly implied bad acts, would have sufficient probative value to outweigh the substantial risk of undue prejudice to the defendant. However, in this case the medical report, together with testimony of abusive conduct of a contemporary and ongoing nature, is highly probative and outweighs the risk of undue prejudice. Therefore, we find no abuse of the trial court's discretion.

The defendant also alleges error in the trial court's exclusion of statements made by Brian Tanner, the defendant's five-year-

old son. Brian was questioned by police officers the day after Tawnya was injured. It is clear that Brian's statements were not spontaneous but were in response to questions that were often leading. There was no cross-examination. However, at the preliminary hearing, the court interviewed Brian to determine his competency, and he was examined at length by both the State and the defendant. The record shows that Brian was easily influenced by the questions asked, as counsel drew confusing and contradictory statements from him. The defendant herself then filed a motion *in limine* to exclude Brian's testimony, claiming that he would not be able to testify with the reliability required by law, that he could not relate the events of the evening in question, and that he was highly susceptible to suggestion and given to fantasy.

At trial, the court questioned Brian prior to ruling on the defendant's motion *in limine*. At that time, Brian would not respond, and the court ruled that he was incompetent to testify. Following that ruling, which in effect granted her motion, the defendant attempted to elicit the substance of Brian's statements at the police interview from a police officer testifying for the prosecution. The trial court ruled that such testimony would be hearsay and that it was not admissible as an exception to the hearsay rule either as a contemporaneous statement or because Brian was unavailable.[8] The defendant continued to object to Brian's testimony given at the preliminary hearing that the prosecution attempted to introduce. The court excluded that testimony, also. The determination of competency of a minor is within the discretion of the trial court pursuant to the standards set out in *State v. Smith*, 16 Utah 2d 374, 401 P.2d 445 (1965). *See, e.g., State v. Wilkerson*, Utah, 612 P.2d 362 (1980). The court's ruling will not be disturbed in the absence of a clear showing of abuse. The court, in person, attempted to interview Brian and made a firsthand assessment of his competency, which we will not second-guess. We find no abuse of the court's discretion in ruling the witness incompetent to testify and in excluding his testimony.

Finally, the defendant argues that there was insufficient evidence to support the verdict. In reviewing a claim of insufficient evidence, this Court must view the evidence in the light most favorable to the verdict and will interfere only when the evidence is so lacking and insubstantial that a reasonable person could not possibly have reached a verdict beyond a reasonable doubt. *See State v. McCardell*, Utah, 652 P.2d 942 (1982), and cases cited. This standard of review is the same where the court, rather than a jury, acts as the finder of fact. *See State in re K.K.H.*, Utah, 610 P.2d 849 (1980). The defendant claims that the circumstantial nature of the evidence, together with the evidence of a favorable polygraph test, is sufficient to show that a reasonable person could not possibly have reached a verdict beyond a reasonable doubt.

We have frequently stated that circumstantial evidence alone may be competent to establish the guilt of the accused. *See, e.g., State v. Clayton, supra.* The defendant emphasizes that in order to warrant conviction, circumstantial evidence must exclude every reasonable hypothesis other than the defendant's guilt. *See, e.g., State v. John*, Utah, 586 P.2d 410 (1978). However, in order to meet this standard, the evidence need not exclude every hypothesis, "however unsubstantial or incredible, which a party to such a controversy may dream up." *Id.* at 412. In *Huerta v. State*, Tex.App., 635 S.W.2d 847 (1982), the court stated that "[t]he rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another

---

**8.** The defendant did not make a proffer of Brian's statements at the police interview at trial or before. That interview is not part of the record and will not be reviewed by this Court although the defendant has included some of that material in her brief. An appellant must show error or prejudice from the record. *See State in re Schreuder*, Utah, 649 P.2d 19 (1982), and cases cited.

person, but the hypothesis intended is a *reasonable* one consistent with the circumstances and facts proved." *Id.* at 851 (quoting from *Flores v. State,* Tex.Cr.App., 551 S.W.2d 364, 367 (1977)) (emphasis in original). In *Aldridge v. State,* Miss., 398 So.2d 1308 (1981), the court addressed the same objection to circumstantial evidence:

> To sustain a verdict based on circumstantial evidence, it is not necessary that such evidence exclude every possible doubt or theoretical supposition in no way related to the facts or circumstances of the case. It is enough that such evidence exclude every reasonable hypothesis of innocence.

*Id.* at 1311 (citation omitted). These statements, taken from cases involving similar fact situations, are in accord with our existing law and our view of the evidence in this case. The court was entitled not only to consider the evidence presented, but also to make reasonable inferences. *See, e.g., State v. McCardell, supra.* If circumstantial evidence and reasonable inferences were to be discounted, it is doubtful that convictions would ever be found in cases of this nature where the crime takes place in the home and where the youth of the victim, combined with the relationships of the family members, makes it difficult, if not impossible, to obtain direct evidence. *See State v. Tucker, supra; State v. John, supra.* In the instant case, competent evidence was presented that the child was the victim of a continuing pattern of abuse, that the defendant habitually abused the child, and that the defendant was present and in actual custody of the child when the injury occurred. The court was entitled to draw reasonable inferences and conclude that Tawnya died as a result of injuries inflicted by the defendant. There is no fact or circumstance in evidence that supports any other reasonable conclusion.

The defendant claims that the favorable results of the polygraph test that she took automatically raise a reasonable doubt as to her guilt.[9] We do not agree. The court was not obligated to give more weight to that evidence than to other evidence presented. The weight and credibility given the evidence is decided by the finder of fact, in this case, the court. The court did not err in basing its conclusions on the other evidence before it. We do not hold that a favorable polygraph test raises a reasonable doubt as a matter of law.

The defendant's conviction is affirmed.

HALL, C.J., and OAKS and HOWE, JJ., concur.

STEWART, Justice (dissenting):

I dissent. The trial of this case was, I submit, tainted by the admission of prejudicial battered child syndrome evidence that lacked an adequate foundation, and by the testimony of the prosecution's chief witness that on its face was at least partly perjurious, if not entirely so. I would reverse and remand for a new trial.

There is no real issue as to the cause of Tawnya Tanner's death. The unrebutted evidence established that the cause of death was a blow to the head. The defendant made no claim that she had accidentally or mistakenly caused the death. Her claim was that she had not caused the death in any way. The only real issue is who killed Tawnya Tanner. There are only two realistic possibilities: either Kathy Tanner, the defendant, or Leland Foote, her live-in boyfriend.

The brutal killing of a three-year-old child naturally evokes deep and powerful feelings of revulsion and abhorrence which are common to all. Yet such cases are precisely those in which it is most important to adhere to those rules of evidence which are designed to sift truth from error and to prevent the insinuation of prejudice into the truth-finding processes of the courts. Compliance with those rules is essential to prevent abhorrence for the crime

---

**9.** These results were admitted over the objection of the State, but the State has not chosen to challenge that ruling by cross-appeal. We therefore do not address the question of admissibility of polygraph test results in the absence of stipulation by the parties. *See State v. Collins,* Utah, 612 P.2d 775 (1980).

committed from tainting the crucial determination of who committed the crime.

Without even defining what battered child syndrome evidence is, the majority holds that it is admissible even though there is no evidence that the defendant was the sole caretaker of the child when the various injuries, including the fatal blow, were inflicted. The majority states with respect to battered child syndrome evidence that "[t]he term should not be applied broadly" but "[t]he expert should be able to testify in detail" and then concludes that "[a]ny deficiencies in the testimony ... go to its weight rather than its admissibility." The Court's theory of the admissibility of the battered child syndrome evidence is that it established a "pattern of conduct" by the defendant. Thus, under the Court's rationale, it appears that the explosive battered child syndrome evidence may be admitted in virtually all cases in which a parent is accused of killing his or her child and the child has been battered, even though, as here, there is another person who may have been responsible for the fatal injury, and perhaps some of the abuse. On the facts of this case, the Court's ruling represents, I submit, a departure from basic rules of evidence.

The majority opinion states that the "key evidence in this case is the mute testimony of the body of three-year-old Tawnya Tanner." I disagree. That evidence surely does tend to establish that Tawnya was badly abused; indeed, there was other evidence that the defendant herself had on occasion abused the child. But the key evidence in the trial of the case was the highly inconsistent, and at least partially, but undeniably, perjurious testimony of the State's key witness, Leland Foote, the defendant's live-in boyfriend. And truly the key question is whether the defendant or Leland Foote committed the crime. *Foote had earlier pleaded guilty to a manslaughter charge for the exact same crime pursuant to a plea bargain, after having been first charged with second degree murder.*

Battered child syndrome evidence is circumstantial evidence that the caretaker of a child may be responsible for the fatal injury of a child. However, in this case, Foote was also a caretaker. His testimony pointed the finger of guilt solely at the defendant. It is at best strange that notwithstanding Foote's plea of guilty to the charge of killing Tawnya, his trial testimony placed the entire blame for the death of Tawnya on the defendant and in no way inculpated him in the crime in the slightest degree. That testimony must have been contrary to the evidence which the prosecution had against Foote, or it would never have filed the second degree murder charge against Foote, nor would Foote have pleaded guilty. Into these extraordinary circumstances, the "battered child syndrome" evidence was interjected along with other evidence of defendant's prior misconduct.

A key evidentiary question is the proper application of Rule 55, Utah R.Evid., which states:

> Subject to Rule 47 *evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed another crime or civil wrong on another specified occasion but,* subject to Rules 45 and 48, such evidence is admissible when relevant to prove some other material fact including absence of mistake or accident, motive, opportunity, intent, preparation, plan, knowledge or identity. [Emphasis added.][1]

The majority reads Rule 55 as if the only inquiry is one of simple relevancy and on that basis allows past bad acts by the defendant, including the battered child syndrome evidence, to be admitted into evidence. I submit that that reading of Rule 55 departs from established rules of law in admitting evidence tending to show that the defendant on occasion abused Tawnya

---

**1.** This rule has since been revised and recodified as Utah R.Evid., Rule 404(b) (1983).

for the purpose of proving a pattern of conduct on the part of the defendant.

Such evidence may have probative value as to the identity or intent of the person who committed the crime, if it is established that the child was in the sole care of that person.

The breadth of the majority's holding, however, opens the door to virtually any child abuse evidence when an infant is killed, without regard for those rules of evidence designed to insure a verdict based on the allegations of the crime charged and not the character of the defendant. In essence, the majority ignores the long-standing rules that restrict the use of prior crime evidence by establishing a high threshold of relevancy and allows the battered child syndrome evidence on the same test of relevancy used for run-of-the-mill evidence. If that were the established law in determining admissibility of prior crime evidence, there would be no need for Rule 55, which should serve to insure fairness and reliability in the truth-seeking function of a trial.

## I.

The majority's definition of battered child syndrome evidence and its explanation of why it is admissible is both confusing and inconsistent. In its own language, and sometimes quoting with approval from other courts, the majority states that the evidence is admissible because it states "no opinion regarding a defendant's culpability," "does not directly indicate the culpability of any particular defendant," "only indicates the cause of death," and "merely describes the nature of the injuries." Furthermore, the majority states that "[m]edical testimony indicated that Tawnya's fatal injury was part of a pattern of abusive injuries."

In justifying the evidence admitted in this case, the majority cites experts who state that the diagnosis is "really descriptive of a pattern of conduct on the part of the parents," is "concern[ed] with the causative factors outside of the body of the child," includes a description of the par-

ents' conduct and characteristics, *and allows for an inference that the parent or guardian inflicted the injuries.* Thus, on the one hand, the majority asserts that the battered child syndrome evidence is not accusatory and only describes the cause of death (which in fact it does not do), and on the other hand admits that such evidence incriminates the parents. The majority cannot have it both ways.

In the instant case, the testimony included reference to the defendant's culpability. The expert testified regarding the typical profile of an abusing parent and the inadequate explanation for Tawnya's injuries. The majority states:

> The doctor also testified that abusive disciplinary methods are frequently part of the battered child syndrome, that the parents of such children are typically very young or inexperienced and that they are likely to have a history of prior abusive conduct. Dr. Palmer went on to identify in Tawnya the characteristics of the battered child, emphasizing in particular the inadequate explanation given by the defendant for Tawnya's injuries.

That testimony goes beyond battered child syndrome evidence which describes the child's injuries, and falls into the category of battering parent syndrome evidence, which includes a profile of the typical battering parent.

Those courts which have considered the admissibility of battering parent syndrome evidence have warned against the improper use of such evidence. In *Sanders v. State,* 251 Ga. 70, 303 S.E.2d 13 (1983), which dealt with evidence of the traits of a battering parent, the court stated that such evidence should not be allowed unless the defendant places his character in issue or raises some defense that would make the evidence relevant in rebuttal. In *State v. Loebach,* Minn., 310 N.W.2d 58 (1981), the court, in addressing a similar issue, stated that such evidence is not admissible unless the defendant raises the issue of character. *In both cases, the courts found error in the admission of the evidence,* but other

**554**

overwhelming evidence supported the verdicts.

In the present case, the only direct evidence probative of the defendant's guilt came from a perjured witness—the defendant's live-in boyfriend—who had already pleaded guilty to having killed the child after striking a bargain with the prosecutor to obtain a reduction in the charge against him from second degree murder to manslaughter. Under the circumstances, that evidence is highly suspect. In *State v. Mulder,* 29 Wash.App. 513, 629 P.2d 462 (1981), the court allowed child abuse syndrome evidence but stated that other *"[e]vidence must still be produced to establish that it was the defendant who caused the injuries in question." Id.* 629 P.2d at 463 (emphasis added). That is not only lacking in this case, but there is evidence quite to the contrary.

One commentator, who favors admissibility of battered child syndrome evidence, agrees that the evidence may be used too broadly: "[I]f the 'battered child syndrome' diagnosis were used indiscriminately, a parent might be convicted for a beating administered by another person." Note, "Evidence—Child Abuse—Expert Medical Testimony Concerning 'Battered Child Syndrome' Held Admissible," 42 Fordham L.Rev. 935, 941 (1974). This comment is particularly appropriate in the instant case. It is not unusual for the male companion of a female who has a child whom he has not fathered to engage in acts of child abuse that may kill a child or result in a battered child syndrome. Even babysitters have been convicted of homicides which could be attributed to a parent or parents who have abused a child.

In my view, the analysis of whether battered child syndrome evidence is admissible must begin with the long-established proposition that a person under our system of law may be tried only for a specific act and not for his character. Unlike some legal systems, our criminal justice system is concerned with whether a defendant committed a particular criminal act, not whether the defendant is an unregenerate person who has failed in the past to adhere to the various customs and laws of our society. Rule 55 of the Utah Rules of Evidence strikes a balance between this proposition and the rules of relevancy by limiting the admissibility of prior acts to instances where they are especially probative.

Evidence of criminal acts having a particular probative value that goes beyond the usual test for relevancy may be admissible despite the greater likelihood of prejudice. *McCormick on Evidence* 447 (2nd ed. 1972) states:

> The disfavor for receiving proof of the character of a person as evidence that on a particular occasion he acted in keeping with his disposition is strongly felt when the state seeks to show that the accused is a bad man and thus more likely to have committed the crime. The long-established rule, accordingly, forbids the prosecution, unless and until the accused gives evidence of his good character, to introduce initially evidence of the bad character of the accused. It is not irrelevant, but in the setting of a jury trial the danger of prejudice outweighs the probative value.
>
> This danger is at its highest when character is shown by other criminal acts, and the rule about the proof of other crimes is but an application of the wider prohibition against the initial introduction by the prosecution of evidence of bad character. The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character. [Footnotes omitted.]

In *State v. Nemier,* 106 Utah 307, 312, 148 P.2d 327, 329 (1944), Justice Wade stated, "It is universally recognized that the state may not prove other similar offenses committed by [the] accused merely to show his bad character and propensity to commit similar crimes and infer therefrom that he probably committed the crime charged." There can be no blinking the fact that such

evidence is relevant. It is the effect of such evidence on the truth-seeking processes of the courts that demands that such evidence be treated with great caution. *See State v. Kappas*, 100 Utah 274, 114 P.2d 205 (1941); *State v. Anderton*, 81 Utah 320, 17 P.2d 917 (1933); *State v. McGowan*, 66 Utah 223, 241 P. 314 (1925).

It is not enough that a person of the defendant's particular character is more likely to have committed the crime than someone else—although that proposition may be empirically true and therefore meet the general test of relevance. Thus, a charge of driving under the influence of alcohol may not be proved by showing that the defendant is an alcoholic; a crime of larceny may not be proved by showing that the defendant is a cleptomaniac or has a sociopathic personality; perjury may not be proved by showing that the defendant is a pathological liar.

Thus, for reasons wholly apart from relevancy, the courts generally bar evidence of other wrongs, with few exceptions, for reasons based upon fundamental principles of justice and the concept that man is an autonomous agent invested with free will whose actions are not governed by forces beyond his control.

The purpose behind not allowing evidence of past wrongs is not to exclude relevant evidence, although that may occur, but to protect defendants from irrational decisions. Dean Wigmore has explained this policy in a discussion of admissibility of past crimes to prove character:

> It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.

J. Wigmore, *Evidence*, § 194 at 646 (1940). Dean Wigmore enumerates three reasons why evidence of past crimes should not be admitted absent special circumstances:

> (1) The over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts; (2) the tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offences; ... (3) The injustice of attacking one necessarily unprepared to demonstrate that the attacking evidence is fabricated ....

*Id.* at 650.

All these reasons apply to battered child syndrome evidence, and the rules of evidence should be applied to prevent the defendant from being found guilty because he or she had previously committed numerous wrongs. Even if a parent has abused a child, the parent should not be subjected to the risk of conviction for homicide solely on the basis of his or her prior acts. This is not to excuse wrongs, past or present, but to protect the innocent:

> [I]t is to be noted, the judicial exposition of these reasons shows the fallacy of supposing, as some do, that the object of the rule is merely to show mercy to the guilty one, to give him a final chance for life and liberty by artificially handicapping the prosecution .... On the contrary, the object is to prevent a person not guilty of the present charge from being improperly found guilty of it. If it be said that nevertheless this is still a spirit of kindness to the guilty, seeking to prevent his being punished now for what he has formerly done, the answer is that we are nevertheless protecting a person who is theoretically innocent of the present charge from being now found guilty of a past crime which he was not aware would be charged against him and which he has no opportunity to show to be fabricated. There is quite enough maudlin pity for criminals in our law in other respects; and we ought not to give support to that tendency by claiming on such grounds the doctrine here involved,—a doctrine which is in

truth mainly designed to protect the innocent and not the guilty.

*Id.* at 651.

This Court applied Rule 55 to exclude evidence of past bad acts in *State v. Goodliffe,* Utah, 578 P.2d 1288 (1978), in which evidence of past bad acts was used to convict the defendant of forcible sexual abuse of a six-year-old girl. The prosecution argued that the evidence was admissible to rebut the defendant's claim of veracity and truthfulness, but on appeal, the Court reversed the conviction holding that the evidence was inadmissible under Rules 47 and 55:

> Bare, *unproven* allegations or " 'complaints" of prior incidents of similar conduct have no relevancy to the issue of defendant's truthfulness or veracity. The admission of such evidence without further explanation could only have caused the jury to speculate about defendant's propensities to commit such crimes and confuse the issues, all to the prejudice of defendant, which necessitates a new trial.

*Id.* at 1290. The crime in *Goodliffe* —sexual abuse of a child—is certainly outrageous, but the Court did not throw out the rules of evidence because of the outrageousness of the crime charged.

## II.

The majority also sustains the admission of additional evidence of past criminal acts other than that evidence admitted under the battered child syndrome theory. The majority indicates that the evidence of past bad acts should be admitted under Rule 55 if the evidence is corroborated by battered child syndrome evidence.

I agree with the majority's opinion that the list of exclusions in Rule 55 is not exhaustive; however, as stated in the concurring opinion (to which the majority adhered) in *State v. Forsyth,* Utah, 641 P.2d 1172 (1982) (Stewart, J.), mere relevancy alone is not the test for admitting evidence under Rule 55. If Rule 55 were interpreted to allow any relevant evidence of past bad acts, the rule would be wholly emasculated and rendered complete surplusage because it is swallowed up by the general relevancy provision of Rule 7(f).

For Rule 55 to protect the fundamental philosophical values upon which our criminal justice system is based, it must be interpreted to exclude evidence of past acts unless the evidence is highly and specifically relevant to a particular issue that is contested in the case. It is not sufficient that it merely have some relevance. As stated in the concurring opinion in *State v. Forsyth,* Utah, 641 P.2d 1172, 1177–78 (1982):

> [A]llowing the admissibility of evidence to turn "on whether that evidence is 'relevant to prove some ... material fact' " and relying on "the basic rule that all evidence having probative value is admissible," fails to take into account the fundamental, time-honored rule that a person should be held criminally accountable only for the particular act charged, and not his character. The law has long recognized the danger that a finder of fact may be unduly influenced by prior criminal acts and has sought to preclude such acts from influencing the outcome.
>
> The rule excluding evidence of prior misconduct to show the character or disposition of a defendant was established not because such evidence was irrelevant, but because of the likelihood that it would skew the fact-finding process.

Even though the evidence need not fall into one of the specific categories listed in the rule, the language of the rule still requires that the evidence prove some material fact other than the disposition to commit a wrong. The majority seeks to justify the admissibility of evidence of past bad acts on the ground that it was relevant to establish the cause of death, even though the evidence of past bad acts added nothing to the unrebutted medical testimony which established the cause of death. That justification is simply not adequate.

The majority also justifies the admissibility of defendant's prior bad acts and the battered child syndrome evidence on the ground that they show *"a specific pattern*

*of behavior by the defendant."* But that is precisely what Rule 55 is aimed at preventing—character evidence that shows a propensity to commit a crime. The majority's stated rationale thus contradicts Rule 55 which states that "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong ...."

The evidence might, however, have been admissible, in my view, on other theories, such as identity, intent, or to rebut a claim of accident. But the evidence of battered child syndrome had no probative value on any issue in this case, except that which was really not in controversy, since the defendant was not shown to have been the sole caretaker at the time of the abusive acts and of the homicide. The prosecution failed to prove that critical point in this case, and without that foundation the evidence should not have been admitted.

### III.

I think this case should be remanded to the trial court for a hearing as to what evidence the prosecutors had which provoked them to file a second degree murder charge against Leland Foote. It is clear beyond question that he perjured himself during his testimony at the trial in this matter and that the testimony he gave which inculpated the defendant was exculpatory as to him. In fact, his testimony was so glaringly untrustworthy that the trial judge specifically admonished the defendant as to the potential consequences of perjury and discontinued taking evidence until Foote could be represented by independent counsel because of the risk he was running in telling different stories.

It may be true that both Foote and the defendant were mutually guilty in causing the death of the deceased, but there is nothing in this record which would support a conviction of Foote even as an accomplice. On the other hand, there was polygraph evidence submitted by the defendant, confirmed by a polygraph expert from the police department, and admitted by the trial court which indicated that the defendant was not guilty of the crime.

Given the highly unusual circumstances of this case, including Foote's plea bargain and perjurious testimony and the admission of the evidence of defendant's prior past wrongs and of the battered child syndrome evidence without a proper foundation, I cannot avoid the conclusion that the defendant did not receive a fair trial. I think the case should be reversed and retried.